**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MONICA EMELDI,
                     *Plaintiff-Appellant,*

v.

UNIVERSITY OF OREGON,
                     *Defendant-Appellee.*

No. 10-35551

D.C. No.
6:08-cv-06346-HO

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Oregon
Michael R. Hogan, District Judge, Presiding

Argued and Submitted
June 9, 2011—Portland, Oregon

Filed March 21, 2012
Amended October 17, 2012

Before: Raymond C. Fisher, Ronald M. Gould, and
Richard A. Paez, Circuit Judges.

Order;
Dissent to Order by Chief Judge Kozinski;
Opinion by Judge Gould;
Dissent by Judge Fisher

## COUNSEL

David Force, Law Offices of David C. Force, Eugene, Oregon, for plaintiff Monica Emeldi.

Denise Gale Fjordbeck, Assistant Attorney General, Office of the Oregon Attorney General, Salem, Oregon, for the University of Oregon.

## ORDER

The opinion in the above-captioned matter filed on March 21, 2012, and published at 673 F.3d 1218, is amended as follows and is simultaneously filed with this order:

At slip opinion page 3268, line 2, add a footnote after <544 U.S. at 173.>, stating: <Like the Supreme Court in *Jackson*, "[w]e do not rely on regulations extending Title IX's protection beyond its statutory limits." 544 U.S. at 178. Our decision rests on "the statute *itself*," not on regulations implementing Title IX. *Id.*; *see also* 34 C.F.R. §§ 100.7(e), 106.71.>.

Judges Gould and Paez have voted to deny the petition for panel rehearing and rehearing en banc. Judge Fisher has voted to grant the petition for panel rehearing and rehearing en banc. The full court has been advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc, and the matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35. The petition for panel rehearing and rehearing en banc is denied.

No future petitions for rehearing or rehearing en banc will be entertained.

**IT IS SO ORDERED.**

---

Chief Judge KOZINSKI, with whom Judges O'SCANNLAIN, GRABER, FISHER, TALLMAN, BEA and M. SMITH join, dissenting from the order denying the petition for rehearing en banc:

Bad facts make bad law. No facts make worse law. That's what happened here when the panel majority allowed plaintiff Monica Emeldi to escape summary judgment even though she produced no evidence of causation, an element of her retaliation claim. In the place of evidence, the majority permits Emeldi to create a material issue of fact by speculation. This opinion undermines the pleading framework for Title IX and Title VII and erodes the well-established standards for summary judgment. Worse still, it jeopardizes academic freedom by making it far too easy for students to bring retaliation claims against their professors. Plaintiffs will now cite *Emeldi* in droves to fight off summary judgment: We may not have any evidence, but it's enough under *Emeldi*. Defendants will go straight to trial or their checkbooks—because summary judgment will be out of reach in the Ninth Circuit.

# I

Monica Emeldi, a former Ph.D. candidate at the University of Oregon, had a falling out with her dissertation advisor. *Emeldi* v. *Univ. of Or.*, 673 F.3d 1218, 1221-22 (9th Cir. 2012). Emeldi says that she complained to a university administrator about sex discrimination, the administrator relayed this complaint to Emeldi's advisor and the advisor resigned as her dissertation chair in retaliation. *Id.* at 1222, 1225. Emeldi also asserts, again without evidence, that the advisor prevented Emeldi from finding a replacement, thus forcing her to withdraw. *Id.* at 1222.

Under the established Title VII pleading framework, which the majority applies to this Title IX case, Emeldi must show a causal connection between her complaint and her advisor's resignation. *Surrell* v. *Cal. Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008). Emeldi says the administrator told the advisor about the discrimination complaint in a phone call between the two. *Emeldi*, 673 F.3d at 1222, 1226-27. But Emeldi has no evidence that the administrator and the advisor discussed discrimination. To the contrary, the administrator stated under oath that she didn't talk to the advisor about discrimination and that she couldn't have because she never heard Emeldi make the complaint in the first place. *Id.* at 1222, 1226.

This case is not at the pleading stage. The parties have gone through discovery and Emeldi has come up with nothing to support her speculation that the discrimination complaint was discussed. All we're left with is Emeldi's claim, sourced to her own amended declaration, that the administrator said she "debriefed" the advisor about the conversation with Emeldi. *Id.* at 1222, 1226 n.3, 1228. Debriefing the advisor is hardly an admission that they discussed discrimination. This is especially true in light of the fact that the administrator asked for and received Emeldi's permission to call the advisor about Emeldi's dissertation difficulties, *id.* at 1235 & n.3 (Fisher, J.,

dissenting), and in light of the fact that the administrator testi-fied she'd never heard the discrimination complaint, *id.* at 1222, 1226 (majority opinion).

The majority finds the debriefing "evidence" sufficient to reverse the grant of summary judgment. It holds that "a jury reasonably could infer that [the administrator] passed Emeldi's complaint on to [the advisor]." *Id.* at 1226. This is a serious error that contravenes our own precedent, as the dis-sent notes: "[W]hen the non-moving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact." *Id.* at 1233 (Fisher, J., dissenting) (quoting *Hansen* v. *United States*, 7 F.3d 137, 138 (9th Cir. 1993) (per curiam)). It's also contrary to the teachings of the Supreme Court, by permitting Emeldi to plead her way out of summary judgment.

The Supreme Court has held that "mere pleadings them-selves" can't defeat summary judgment. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 324 (1986). And even where some evi-dence is presented beyond the pleadings, that's still not enough "[i]f the evidence is merely colorable, or is not signif-icantly probative." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (internal citations omitted). The supposed admission about debriefing says nothing about whether dis-crimination was discussed, so it's not even relevant evidence. But even if it were, it's of vanishing probative value, far short of the threshold needed to stave off summary judgment.

The most Emeldi can say about the phone call is that the administrator and the advisor discussed something about Emeldi's conversation with the administrator. The Supreme Court warned against defeating summary judgment based on inferences drawn from such "ambiguous conduct": "[C]onduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy." *Matsushita Elec. Indus. Co.*

v. *Zenith Radio Corp.*, 475 U.S. 574, 597 n.21 (1986); *see also Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 554 (2007). The administrator's phone call to the dissertation advisor is just such an example: It's as consistent with a discussion about Emeldi's dissertation as with any mention of discrimination. The majority is wrong to rely on it as evidence of causation.

The danger of the majority's opinion should be obvious. If a plaintiff can escape summary judgment based on his own vague description of what someone else said during a conversation with a third party, defendants can never get summary judgment because the plaintiff will always have his own word to fall back on. This would thwart the Supreme Court's directive that summary judgment be "regarded not as a disfavored procedural shortcut," but as "an integral part of the Federal Rules" designed "to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (internal quotation marks omitted). It would also cut against the grain of the Supreme Court's recent opinions in *Twombly* and *Iqbal*, which required plaintiffs to provide more than "bare assertions" or a " 'formulaic recitation of the elements' " in pleading a claim. *Ashcroft* v. *Iqbal*, 556 U.S. 662, 681 (2009) (quoting *Twombly*, 550 U.S. at 555). Even at the motion to dismiss stage, plaintiffs must do something to "nudge[ ] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Emeldi has made it all the way past summary judgment without doing even that.

## II

The majority's opinion would be bad enough if confined to the Title VII context. But this decision will impair the open exchange of ideas in our schools and universities if applied, as the panel majority does, in the Title IX context. Even accepting that the Title VII pleading standard applies to Title IX cases, no one claims the pleading standard should be *lower* for students suing professors in the Ivory Tower than for

employees suing supervisors on the factory floor. The relationship between professor and Ph.D. student requires both parties to engage in candid, searing analysis of each other and each other's ideas. Methodology, philosophy and personality often lead to intractable disputes and, when they do, the professor must be free to walk away without fear of a frivolous discrimination suit.

It's not just the practicalities of academia that require this freedom. The First Amendment does, too. *See Regents of Univ. of Cal.* v. *Bakke*, 438 U.S. 265, 312 (1978). In equating Title IX with Title VII, the panel overlooks the critical differences between academia and the outside world. It applies the law so loosely that one of the laxest interpretations of the pleading standard is now planted squarely in academia, just where the pleading standard should be highest. If this ill-considered precedent stands, professors will have to think twice before giving honest evaluations of their students for fear that disgruntled students may haul them into court. This is a loss for professors and students and for society, which depends on their creative ferment.

* * *

A great deal is at stake in the decision whether to allow a case like this to go to trial. In the Title VII context, subjecting employers to the expenses and risks of trial when the employee has presented nothing but unsubstantiated suspicions of discrimination imposes huge costs on businesses and makes them targets for hold-up settlements. *See, e.g.*, *Wal-Mart Stores, Inc.* v. *Dukes*, 131 S. Ct. 2541 (2011). The costs are even greater in the Title IX context, where the vagaries of litigation will chill academic freedom and intimidate institutions into granting degrees to undeserving candidates. Would any of us choose to go under the scalpel of a surgeon who "earned" his M.D. by bullying his medical school with unsubstantiated claims of unlawful discrimination? *Emeldi* is a very, very bad result, which bespeaks a major misapplication

of long-standing legal principles to the sensitive area of academia. It invites all manner of frivolous suits while further diluting the authority of our schools and universities to maintain standards of academic excellence among students and faculty. I can only hope it will not be followed by other courts considering the issue.

## OPINION

GOULD, Circuit Judge:

In *Jackson v. Birmingham Board of Education*, the Supreme Court held that retaliation by a federally funded educational institution against someone who complains of gender discrimination is actionable under Title IX. 544 U.S. 167, 171 (2005). We must decide what a plaintiff must prove to prevail on a Title IX retaliation claim, and whether plaintiff Monica Emeldi adduced sufficient evidence of her claim to overcome summary judgment.

## I

Monica Emeldi sued the University of Oregon, alleging that it prevented her from completing a Ph.D. program in retaliation for having complained of gender-based institutional bias in the University's Ph.D. program, and gender discrimination by her faculty dissertation committee chair.

Emeldi was a Ph.D. student in the University of Oregon's College of Education, in its Department of Special Education. Her advisor and dissertation committee chair, Edward Kame'enui, took a sabbatical starting in the fall of 2005. Emeldi asked Robert Horner, another professor, to replace Kame'enui as her dissertation chair. Horner agreed. During the time of Emeldi's work with Horner, Emeldi and other Ph.D. candidates complained to Mike Bullis, Dean of the Col-

lege of Education, about lack of adequate support for female Ph.D. candidates. In May 2007, Emeldi produced a memo summarizing a meeting between Bullis and several graduate students. That memo lists, as one of fifteen topics discussed, the students' concern about the Department's lack of female role models. The memo says:

> Students request that qualified Women be hired into tenured faculty positions [emphasis]. Students attempted and were unable to identify a current female appointment to a tenured faculty position. Students need to experience empowered female role models successfully working within an academic context [emphasis]. Doctoral students request that the college model a balance of gender appointments that reflect the proportion of student gender population ratios.

While the University maintains that no one other than Bullis knew of the memo, Emeldi's position was that she was told that all Department faculty received copies; that it was "common knowledge in the College of Education" that she was dissatisfied with the Department's level of support for women; that Horner, her dissertation chair, was treating her less favorably than his male graduate students and did not give her the same support and attention that he gave male candidates; that Horner often ignored her and did not make eye contact with her; that, when Emeldi attended Horner's group meetings with his graduate students, either she was not on the agenda, or no substantial or meaningful work of hers was discussed; and that Horner's male students had opportunities that were not available to his female students, such as access to more and better resources, including more office space and better technology for collecting data.

Whatever their teacher-student relationship at first, Emeldi's relationship with Horner as Ph.D. advisor soured. The reasons for this development are unclear. The University

vigorously disputes that Horner treated his male students more favorably than his female students, and its position is that Emeldi's relationship with Horner deteriorated because Emeldi "refused to listen to Dr. Horner regarding the necessary changes to produce a dissertation that would be a focused piece of scholarship."[1] Emeldi attributes the worsening relationship to Horner's gender animus.

In October 2007, Emeldi met with University administrators Annie Bentz and Marian Friestad to discuss her worsening relationship with Horner. Emeldi says that she complained to Friestad about the Department's "institutional bias in favor of male doctoral candidates, and a relative lack of support and role models for female candidates." To illustrate her experience of this "institutional bias," she said that she "identified the chair of [her] dissertation committee, Dr. Rob Horner, as being distant and relatively inaccessible to me." According to Emeldi, Friestad then alerted Horner that Emeldi had accused him of discriminating against her. While Friestad does not dispute that she spoke with Horner, her version of the conversation Emeldi described is markedly different. Friestad, who is an administrator and professor, says that Emeldi never alleged discrimination in their discussion about Horner and that Friestad and Horner discussed only Emeldi's dissertation, not an allegation of discrimination. However, Emeldi in her amended declaration explicitly said that Friestad told Emeldi that Friestad had "debriefed" Horner on the conversation Friestad had with Emeldi. Within a few weeks, Horner, by email, resigned as Emeldi's dissertation chair. According to Emeldi, Horner then told other Department faculty members that

---

[1]The summary judgment record contains evidence of email communication between Horner and Emeldi in mid-2007. In July 2007, Emeldi submitted to Horner a "Dissertation Prospectus" that laid out her research plans. In September 2007, Horner provided feedback on Emeldi's proposal. Horner's feedback stated that Emeldi had proposed a "tremendously interesting project," and had "done brilliantly in [her] efforts," but also expressed concern that "the reader struggles to find the details that can be examined within a dissertation."

Emeldi should not be granted a Ph.D., and should instead be directed into the Ed.D. program, which Emeldi says is a less prestigious degree. The University denies that this occurred.

Emeldi sought a new dissertation chair, but did not find one. According to Emeldi, she asked fifteen faculty members in her Department, some of whom said that they were too busy and some of whom said that they were not qualified to supervise her research. The University doesn't dispute that she inquired of fifteen faculty members, but criticizes Emeldi's efforts to obtain a new dissertation chair as inadequate, arguing that she did not try to recruit two faculty members who were qualified and available, including her former advisor Kame'enui. While seeking a new dissertation chair, Emeldi also pursued the University's internal grievance procedure, which, she says, contributed to her inability to find a willing faculty member. Unable to complete her Ph.D. without a dissertation chair, Emeldi abandoned her pursuit of the Ph.D. degree, thus effectively withdrawing from the University.

Emeldi then filed this lawsuit in Oregon state court. The University timely removed the action to federal court, but mistakenly said in its notice of removal that Emeldi's suit was filed in Linn and Multnomah Counties, when in fact the suit was filed in Lane County. The University then filed an amended notice of removal correcting these errors, but the amendment was filed after the 30-day removal deadline had expired. Emeldi sought remand on the basis that the defective notice of removal was fatal to federal jurisdiction, but the district court rejected this argument.

After a period of discovery, the University moved for summary judgment, which Emeldi opposed. The district court granted summary judgment for the University on the alternative grounds that Emeldi did not engage in protected activity and that she adduced no evidence showing that the University's adverse actions were causally related to her protected

activity. *Emeldi v. Univ. of Or.*, No. 08-6346, 2010 WL 2330190, at *2-5 (D. Or. June 4, 2010). Emeldi timely appealed.

## II

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review a grant of summary judgment de novo. *Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir. 2002). "Summary judgment is warranted when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).

## III

**[1]** We start with the statutory premise that Title IX of the Education Amendments of 1972 bars gender-based discrimination by federally funded educational institutions. It provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). In *Jackson*, the Supreme Court held that "[r]etaliation against a person because that person has complained of sex discrimination" is a form of gender-based discrimination actionable under Title IX. 544 U.S. at 173.[2]

**[2]** Until now, we have not had occasion to say what a plaintiff must prove to prevail on a retaliation claim under Title IX. We join our sister circuits in applying the familiar framework used to decide retaliation claims under Title VII.[3]

---

[2]Like the Supreme Court in *Jackson*, "[w]e do not rely on regulations extending Title IX's protection beyond its statutory limits." 544 U.S. at 178. Our decision rests on "the statute *itself*," not on regulations implementing Title IX. *Id.*; *see also* 34 C.F.R. §§ 100.7(e), 106.71.

[3]*See, e.g.*, *Papelino v. Albany Coll. of Pharm. of Union Univ.*, 633 F.3d 81, 91-92 (2d Cir. 2011) (applying the Title VII framework to a Title IX retaliation claim); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67 (1st Cir. 2002) (same); *Clinger v. N.M. Highlands Univ., Bd. of Regents*, 215 F.3d 1162, 1168 (10th Cir. 2000) (same).

In this framework, a plaintiff who lacks direct evidence of retaliation must first make out a prima facie case of retaliation by showing (a) that he or she was engaged in protected activity, (b) that he or she suffered an adverse action, and (c) that there was a causal link between the two. *Brown v. City of Tucson*, 336 F.3d 1181, 1192 (9th Cir. 2003). We have emphasized that to make out a prima facie case, a plaintiff need only make a minimal threshold showing of retaliation. As we have explained, " 'The requisite degree of proof necessary to establish a prima facie case for Title VII claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence.' " *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) (ellipses omitted)); *see also Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) (noting that "[e]stablishing a prima facie case" is "not . . . an onerous requirement").

**[3]** Once a plaintiff has made the threshold prima facie showing, the defendant must articulate a legitimate, non-retaliatory reason for the challenged action. *Davis*, 520 F.3d at 1089. If the defendant does so, the plaintiff must then "show that the reason is pretextual either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (internal quotation marks and citation omitted).

We stress three reasons for adopting the Title VII framework for Title IX retaliation claims. First, the legislative history of Title IX "strongly suggests that Congress meant for similar substantive standards to apply under Title IX as had been developed under Title VII." *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 897 (1st Cir. 1988). The House Report provides:

> One of the single most important pieces of legislation which has prompted the cause of equal employment opportunity is Title VII of the Civil Rights Act

> of 1964 . . . . Title VII, however, specifically excludes educational institutions from its terms. [Title IX] would remove that exemption and bring those in education under the equal employment provision.

H.R. Rep. No. 92-554, at 46 (1972), *reprinted in* 1972 U.S.C.C.A.N. 2462, 2512.

Second, we have found the Title VII framework useful in assessing claims of discrimination and retaliation outside the Title VII context, even where its application is not mandatory. *See, e.g.*, *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (applying the Title VII framework to a claim under the Age Discrimination in Employment Act); *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 754 (9th Cir. 2001) (applying the Title VII framework to an equal protection claim); *Gay v. Waiters' & Dairy Lunchmen's Union, Local No. 30*, 694 F.2d 531, 538 (9th Cir. 1982) (applying the Title VII framework to a claim brought under 42 U.S.C. § 1981).

Third, the Supreme Court has often "looked to its Title VII interpretations of discrimination in illuminating Title IX." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 n.1 (1999). Following this approach, we hold that the Title VII framework generally governs Title IX retaliation claims.

## IV

### A

The first requirement of a prima facie case of retaliation is that the plaintiff engaged in protected activity. Viewing the evidence presented at summary judgment in Emeldi's favor, we hold that Emeldi's complaints to Bullis and Friestad about gender-based institutional bias, and to Friestad about Horner's

unequal treatment of female graduate students, were protected activity under Title IX.

**[4]** As an initial matter, we have no doubt that Title IX empowers a woman student to complain, without fear of retaliation, that the educational establishment treats women unequally. *Jackson*, 544 U.S. at 174; *see also generally* Lucy M. Stark, *Exposing Hostile Environments for Female Graduate Students in Academic Science Laboratories*, 31 Harv. J.L. & Gender 101 (2008). Emeldi's complaint to Friestad that there was institutional bias against women in the Ph.D. program and that her dissertation chair, Horner, was treating his male graduate students more favorably than his female graduate students, is thus unmistakably a protected activity under Title IX. The protected status of her alleged statements holds whether or not she ultimately would be able to prove her contentions about discrimination. *See Moyo v. Gomez*, 40 F.3d 982, 984 (9th Cir. 1994).

Emeldi says that she complained to Friestad about the Department's "institutional bias in favor of male doctoral candidates, and a relative lack of support and role models for female candidates." Illustrating her experience of this "institutional bias" in speaking with Friestad, she says that she "identified the chair of [her] dissertation committee, Dr. Rob Horner, as being distant and relatively inaccessible to me."

**[5]** It is a protected activity to "protest[ ] or other wise oppose[ ] unlawful . . . discrimination." *Moyo*, 40 F.3d at 984; *see also Bigge v. Albertsons, Inc.*, 894 F.2d 1497, 1501 (11th Cir. 1990). In the Title IX context, "speak[ing] out against sex discrimination"—precisely what Emeldi says that she did—is protected activity. *Jackson*, 544 U.S. at 178. Accordingly, we hold that Emeldi has alleged facts that, if true, demonstrate that she engaged in an activity protected by Title IX.

**B**

The second requirement of a prima facie case of retaliation is that the plaintiff suffered an adverse action. Viewing the

evidence presented at the summary judgment stage in Emeldi's favor, we hold that Horner's resignation constitutes an adverse action.

**[6]** In the Title VII context, the Supreme Court has said that the adverse action element is present when "a reasonable [person] would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable [person] from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks and citations omitted). We have held the adverse action requirement was satisfied, for example, when an employee was forced to use a grievance procedure to get overtime work assignments that were routinely awarded to others, *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 848 (9th Cir. 2004), when an employee was assigned more hazardous work than her co-workers, *Davis*, 520 F.3d at 1089-90, and when an employee was laterally transferred or received undeserved poor performance ratings, *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).

**[7]** We will not establish a different rule on adverse action for Title IX than for Title VII. Women students should not be deterred from advancing pleas that they be treated as favorably as male students. A student cannot complete the University's Ph.D. program without a faculty dissertation chair, and the loss of a chair is an adverse action.

**[8]** This sort of adverse action bears analogy to the concept of constructive discharge, in which a retaliating employer creates working conditions so " 'extraordinary and egregious [as] to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job.' " *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (quoting *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000)). Here, although the University did not formally dismiss Emeldi from the Ph.D. program, as a practical matter,

it rendered her unable to complete the degree. A reasonable person in Emeldi's position—someone who had been abandoned by her dissertation chair and who was unable, despite diligent efforts, to secure a replacement chair—could justifiably feel unable to complete the Ph.D. program. A reasonable person would find these events "materially adverse" insofar as they "might have dissuaded" such person from complaining of discrimination in the Department. *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68. We therefore conclude that Horner's resignation was an adverse action.

## C

**[9]** The third requirement of a prima facie case of retaliation is a causal link between the protected activity and adverse action. "At the prima facie stage of a retaliation case, 'the causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative . . . action are not completely unrelated.' " *Poland*, 494 F.3d at 1180 n.2 (quoting *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)) (alteration omitted). Emeldi has met this standard. From the record, we conclude that Emeldi has produced evidence from which a rational factfinder could find a causal link between Emeldi's complaints of gender discrimination in the Department and the adverse actions identified above.

**[10]** First, the proximity in time between Emeldi's complaint to Friestad about Horner and Horner's resignation as her dissertation chair is strong circumstantial evidence of causation. *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1035 (9th Cir. 2006) ("[C]ausation sufficient to establish the third element of the prima facie case may be inferred from . . . the proximity in time between the protected action and the allegedly retaliatory employment decision." (quoting *Yartzoff*, 809 F.2d at 1376)).[4]

---

[4]The dissent suggests that *Cornwell* is irrelevant because, it urges, we there rejected a causal connection. But the idea that a causal connection

**[11]** Second, Emeldi has articulated a theory of how Horner found out about her complaints: Friestad relayed them to him. Emeldi alleges that she complained of Horner's gender bias—among other things—at her October 2007 meeting with Friestad. Friestad admits that she relayed Emeldi's complaints to Horner, but denies that Emeldi raised concerns about discrimination at the meeting. Friestad also insists that she did not inform Horner of any allegations of discrimination. Nonetheless, a reasonable jury, crediting Emeldi's recollection that she complained specifically to Friestad about Horner's favoring of male Ph.D. candidates, could find a causal link between Friestad's conversation with Horner and his resignation from the dissertation chair post. Stated another way, a jury reasonably could infer that Friestad passed Emeldi's complaint on to Horner, and that Horner's resignation not long thereafter[5] as Emeldi's dissertation chair was a response to Emeldi's complaint.

---

can be shown by proximity in time between protected activity and adverse action is the well-established rule followed in many cases. *E.g.*, *Dawson v. Entek Int'l*, 630 F.3d 928, 937 (9th Cir. 2011); *Bell v. Clackamas Cnty.*, 341 F.3d 858, 865 (9th Cir. 2003); *Yartzoff*, 809 F.2d at 1376; *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir. 1986). The application of that rule in *Cornwell* does not negate its application here. In *Cornwell*, we concluded that Cornwell presented "no evidence raising an inference" that his demotion was caused by his complaint because there was no evidence that the person who demoted him knew about Cornwell's complaint before his demotion. 439 F.3d at 1035. We also concluded that the "gap" of nearly eight months between Cornwell's complaint and his termination was "too great to support an inference" that his termination was caused by his complaint. *Id.* Here, by contrast, Friestad "debriefed" Horner about the content of her discussion with Emeldi, thus "raising an inference" that Horner knew about Emeldi's complaint and resigned as a result. *See id.* Also in contrast to *Cornwell*, there was only a short time of a few weeks between Emeldi's discussion with Friestad and Horner's resignation without replacement.

[5]Emeldi's conversation with Friestad took place on or about October 19, 2007. Horner resigned on November 19, 2007. In Horner's November 20, 2007 email to administrator Mike Bullis, Horner stated that Friestad had contacted him a few weeks beforehand.

**[12]** Third, Emeldi offered evidence that Horner exhibited gender-based animus in other contexts. *See Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1095 n.6 (9th Cir. 2005) (stating that "evidence establish[ing] the employer's animus toward the class to which the plaintiff belongs" is relevant to proving causation). Specifically, Emeldi said that Horner gave more attention and support to male students and that he ignored her and did not make eye contact with her. She contended that, when she attended Horner's graduate student group meetings, she was "not on the agenda, or when [she was] on the agenda, that no substantial/meaningful work [of hers was] discussed." She gave specific examples of Horner's male students being given opportunities that were not available to his female students. For example, Horner allegedly gave one male student access to more office space and better technology for collecting data than similar female students.

**[13]** As the above discussion reveals, there is ample circumstantial evidence to establish causation. Emeldi also points to other evidence in the record that would support a jury inference of causation: (1) that Horner resigned as Emeldi's dissertation chair without designating or providing assistance in securing a replacement chair is circumstantial evidence of retaliatory intent; (2) that Horner praised Emeldi on the progress of her dissertation, could, together with other evidence, support the inference that his stated reasons for resigning as her dissertation chair were pretextual;[6] and (3) that Emeldi could not secure a replacement dissertation chair, despite asking fifteen faculty members, is circumstantial evidence that Horner poisoned his colleagues against her.

**[14]** These items together provide a sufficient basis for a jury to find that Emeldi's protected activity brought about Horner's resignation.

---

[6]*See Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003) (stating that evidence of pretext is also probative of causation). We note that the email in which Horner praised Emeldi's dissertation work also contains criticism of her scholarship.

The dissent argues that Emeldi's position is based on impermissible speculation, citing *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011). But this case is nothing like *Cafasso*. There, we rejected Cafasso's claim that her employer eliminated her department and terminated her employment in retaliation for her inquiries about suspected fraud. *Cafasso*, 638 F.3d at 1060-61. The employer's position was that the action was part of a corporate reorganization unrelated to Cafasso's inquiries; Christopher Marzilli, the official who terminated Cafasso, testified that he did not know about her inquiries when he made the reorganization decision; and "Cafasso admitted in deposition that she had no reason to disbelieve Marzilli's account." *Id.* at 1060. Cafasso nevertheless argued for a "cat's paw" theory of liability, *see generally Poland v. Chertoff*, 494 F.3d 1174, 1182-83 (9th Cir. 2007), which we rejected as speculative. *Cafasso*, 637 F.3d at 1061. Cafasso would have had to establish "that one of Marzilli's subordinates, in response to Cafasso's protected activity, set in motion Marzilli's decision to eliminate Cafasso's department and job, and that the subordinate influenced or was involved in the decision or decisionmaking process." *Id.* (internal quotation marks, citation, and alteration omitted). Because Cafasso did not "set forth non-speculative evidence of specific facts" that this chain of events in fact occurred, we concluded that to find liability would require "undue speculation." *Id.*

We do not disagree with the principle that mere speculation cannot raise an issue of fact. But here, by contrast, Emeldi proffered non-speculative evidence supporting reasonable inferences of causation. Her declaration states that she complained to Friestad about gender discrimination in the Department and, at this stage, her assertions must be accepted as true. The dissent reaches a contrary conclusion only by disregarding tried and true principles governing summary judgment. The dissent first asserts that Emeldi's complaint to Friestad that Horner was "distant and relatively inaccessible" is not a claim of gender bias. However, the correct approach

is to consider Emeldi's complaint in its context. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987) ("[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the non-moving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986))). Here, where the complaint that Horner was "distant and relatively inaccessible" immediately followed Emeldi's complaint of institutional bias, a jury could reasonably infer that she was giving an example of the institutional bias that led to inadequate support for women Ph.D. candidates, and indeed the normal reading of her "distant and relatively inaccessible" criticism of Horner in context is that he was relatively inaccessible by contrast to his accessibility for male Ph.D. candidates.[7]

The dissent further argues that, even if "gender discrimination was discussed" between Friestad and Emeldi, it is only speculative to infer that Friestad relayed Emeldi's complaints of discrimination to Horner. Again, the dissent reaches this conclusion only by ignoring the general rules governing summary judgment. As noted above, as the nonmoving party Emeldi was to be believed and reasonable inferences given her. In her amended declaration, she explicitly states that Friestad told her that Horner was "debriefed" on their discussion. If we assume Emeldi's statements are true, a reasonable inference arises that Friestad "debriefed" Horner about Emeldi's complaints of gender discrimination. These facts are sufficient to state a prima facie case.

---

[7]Emeldi's declaration asserted, "I described one possible cause of that problem as an institutional bias in favor of male doctoral candidates, and a relative lack of support and role models for female candidates. I mentioned the content issues in the [May 2007] Student Advisory Board Memo and my concern about gender inequity of the faculty. I identified the chair of my dissertation committee, Dr. Rob Horner, as being distant and relatively inaccessible to me."

**D**

Because Emeldi established a prima facie case of retaliation, we inquire whether the University has stated a legitimate, non-retaliatory reason for the challenged action, and if so, whether Emeldi has shown that the reason is pretextual. *See Davis*, 520 F.3d at 1089.

**[15]** The University says that Horner resigned for a proper reason, that is, because Emeldi did not follow his research advice. Further, University administrators did not provide a dissertation chair because, the University says, the faculty members who Emeldi solicited were unwilling to take Emeldi as a student for legitimate reasons, such as being unavailable or unqualified to advise her research. If credited by the jury, the University states legitimate, non-retaliatory reasons for Horner's resignation.

**[16]** But Emeldi has presented evidence from which a reasonable jury could conclude that the University's account is pretexutal. For substantially the same reasons we concluded that Emeldi proffered sufficient evidence of causation, we likewise conclude that Emeldi's evidence is sufficient to show pretext. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000) (explaining that the causation and pretext inquiries are often overlapping). The proximity in time between Emeldi's complaints of unequal treatment and Horner's resignation as Emeldi's dissertation chair; Friestad's admission that she relayed Emeldi's complaints to Horner; Horner's resignation without providing assistance in securing a replacement chair; other evidence of Horner's gender-based animus; Horner's praise for Emeldi; and Emeldi's inability to secure a replacement dissertation chair, all considered together, could lead a reasonable jury to conclude that Emeldi's complaints of unequal treatment, and not Horner's

dissatisfaction with her research, motivated Horner's resignation.[8]

[17] Because a reasonable jury could conclude from the evidence presented at summary judgment that Horner's resignation was gender-based retaliation, the district court erred in granting summary judgment.

---

[8]The dissent parts company with the majority by concluding that there is no genuine dispute of material fact as to whether the adverse actions suffered by Emeldi were causally related to her complaints of institutional gender bias or as to whether there was pretext. As we have noted, the dissent's conclusions ignore traditional rules for applying Rule 56.

Specifically, the dissent complains that Emeldi did not provide other evidence supporting her assertions. An example concerns Emeldi's complaint that at Horner's graduate student group meetings Emeldi was not on the agenda or if on it her meaningful work was not discussed. These statements are not speculative but based on Emeldi's personal knowledge and would be admissible at trial. Emeldi had direct percipient knowledge of what happened at the graduate student group meetings she attended. The dissent argues there are no minutes in the record so one cannot verify their substance, and that "there is no proffered testimony of other students or faculty members to give credence to Emeldi's perceptions that Horner was slighting her (and presumably other women students)." But her declaration that she "was publicly and chronically ignored in research team meetings by Rob Horner" generates a genuine dispute of material fact. The dissent's insistence on corroborating testimony of others inserts into the law governing summary judgments a precondition that has never been recognized. *See SEC v. Phan*, 500 F.3d 895, 910 (9th Cir. 2007) (holding that district court erred in disregarding declarations as "uncorroborated and self-serving"); *see also* 10A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2727 (3d ed. 2011) ("[F]acts asserted by the party opposing the motion [for summary judgment], if supported by affidavits or other evidentiary material, are regarded as true."). Like much of the dissent, this point goes to the weight of Emeldi's evidence, not to its admissibility and sufficiency to withstand summary judgment.

The dissent characterizes as "speculative" Emeldi's difficulties gaining a replacement chair of her dissertation committee. But it is not speculative for Emeldi to say that she asked fifteen faculty members who declined for various reasons. A reasonable jury could infer that she was blackballed as a troublemaker because of her claims of institutional gender bias in the Ph.D. program.

**E**

We pause to elaborate on the sufficiency of evidence that Emeldi presented in response to the University's motion for summary judgment. When deciding whether an asserted evidentiary dispute is genuine, we inquire whether a jury could reasonably find in the nonmovant's favor from the evidence presented. *See Anderson*, 477 U.S. at 251-52 (stating that summary judgment requires determination of "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

We cannot say that a reasonable jury would be compelled to reject liability. We are mindful that the University has offered evidence that would support a verdict in its favor. For starters, the testimony of Horner and Friestad contradicts Emeldi's account, and emails corroborate the University's version of events. Making matters worse for Emeldi, her own account at times may appear to be inconsistent. In deposition, she testified that she "would be speculating" if she said why she believed Horner's resignation as her dissertation chair was gender-based retaliation.[9] Further, the record does not disclose why, despite unsuccessfully soliciting fifteen faculty members, Emeldi overlooked two professors who, the University says, were qualified and available to replace Horner as Emeldi's dissertation chair. All of this is to say that the University may have a convincing case at trial. However, that the University has presented strong evidence in its defense does

---

[9]While the University characterizes Emeldi's answer as an admission that she does not know whether Horner's resignation was motivated by retaliatory animus, we note that Emeldi clearly says, elsewhere in her deposition, that she believes Horner's conduct was gender-based retaliation. Emeldi might explain to a jury's satisfaction her anomalous deposition comment in a way that would be consistent with the University's liability. Further, in light of the other evidence that we have noted, it would be incorrect to view Emeldi's word choice as conclusive against her.

not undermine our conclusion that there is a genuine dispute of factual issues that requires resolution by a jury.

**V**

Emeldi also challenges federal subject-matter jurisdiction over her case. The basis of her jurisdictional challenge is that the University's original notice of removal mistakenly said that the action was filed in Linn and Multnomah Counties, when in fact it was filed in Lane County. This error was corrected by an amended notice of removal, but Emeldi protests that the amendment was untimely.

"[T]he propriety of removal is determined solely on the basis of the pleadings filed in state court." *Williams v. Costco Wholesale Corp.*, 471 F.3d 975, 976 (9th Cir. 2006) (per curiam). Where, as here, the state court pleadings establish federal jurisdiction, an obvious factual error in the notice of removal is not fatal to jurisdiction. But even if the notice's mistaken listing of the county from which the case was removed were fatal to jurisdiction, the University's amendment would cure the defect. *See Pochiro v. Prudential Ins. Co. of Am.*, 827 F.2d 1246, 1248 (9th Cir. 1987) (holding that insufficient verification of a notice of removal was not fatal to jurisdiction because the technical error was later corrected by amended notice).

**VI**

We reverse the district court's grant of summary judgment on Emeldi's state law claim for the same reasons as Emeldi's Title IX claim.[10] Also, we reverse the district court's award of

---

[10]We need not decide whether, in the context of gender-based retaliation, the state law cause of action is coextensive with Title IX. Because the district court granted summary judgment on Emeldi's state law claim for the same erroneous reasons as her Title IX claim, we need not decide the state statute's coverage.

costs because the University is no longer the prevailing party under Federal Rule of Civil Procedure 54(d). *See Cascade Health Sol. v. PeaceHealth*, 515 F.3d 883, 917 (9th Cir. 2008).

**REVERSED** and **REMANDED**.

---

FISHER, Circuit Judge, dissenting:

I generally agree with much of what my colleagues have to say about extending the principles and jurisprudence developed under Title VII to the context of discrimination against women in colleges and universities under the rubric of Title IX. Ms. Emeldi, however, has not shown that the problems she experienced in her Ph.D. program, and particularly with her supervising faculty advisor, Dr. Horner, were the result of gender discrimination rather than an unfortunate — but not unlawful — breakdown in the academic relationship between a master professor and a graduate student. The record plainly reveals Emeldi's frustration with her lack of progress on completing her Ph.D. studies and her dissertation, including problems she attributed to Horner as her dissertation chair. She became so frustrated that she finally complained to University administrators. She may have believed these problems and Dr. Horner's actions were caused by his bias against her as a woman. But this is a retaliation case, where it is critical that she present evidence from which a reasonable jury could find that Horner (a) *knew* she believed him to be gender biased, and (b) resigned in retaliation *because* she made such an allegation. She simply has not done so, no matter how sympathetic one might be to her academic disappointments.

We need to be cautious when transporting the doctrines that govern the workplace into the university setting, where the roles of student and teacher, especially in a Ph.D. program, are so bound up in personal interactions and subjective judg-

ments. To turn a falling out between a male professor and a female doctoral candidate into a jury trial over the professor's alleged bias against women should not happen unless there is good evidence to support the charge of discrimination based on gender. Because Emeldi's evidence has not met that threshold, I respectfully dissent.

In sum, Emeldi relies almost entirely on her own speculation and conclusory allegations, without any supporting factual data. I do not believe she has provided sufficient evidence of causation to make out a prima facie case of gender-based retaliation. Even assuming she has made a prima facie case, she has utterly failed to show that Horner's stated reason for resigning as her dissertation chair — that she had come to view his role as her dissertation chair as "a barrier to her advancement" — had anything to do with her being a woman and was merely a pretext.

## I.   Framework

The majority joins the First, Second and Tenth Circuits in applying the Title VII framework to a Title IX retaliation claim. Maj. Op. 12457-58 & n.2. I agree that this framework should apply to Title IX retaliation cases arising in the *employment* context. But extending the employment model wholesale into the *teacher-student* context — particularly to a graduate school Ph.D. program — is problematic because these contexts differ in significant ways. The academic process involves highly personal, idiosyncratic relationships that depend on various professional qualities. This is especially the case for dissertation chairs and their Ph.D. students, which are not run-of-the-mill relationships between managers and employees. A dissertation chair must have expertise in the student's area of research as well as be someone with whom the student can work closely, in a process that by its very nature requires the professor to be highly critical of the student's work and capabilities. The professor's role as a dissertation chair is voluntary, unlike a business manager whose

very job is to supervise a group of subordinate employees. In agreeing to supervise a student, a dissertation chair enters a relationship where the responsibilities run both ways — the student owes the professor time, intellectual commitment and work product, and the dissertation chair implicitly agrees to provide the same in the form of guidance and critical evaluation. Unlike the relationship between a manager and an employee, each relationship in a Ph.D. program is inherently unique and highly subjective. Of course, this does not mean professors can be permitted to discriminate against students because of their gender or other protected status, but we must be careful not to open them up to claims of discrimination based only on unsubstantiated allegations any time there is an intellectual disagreement about a research project.

Despite these cautions, however, I will accept that we should apply the Title VII framework to Emeldi's Title IX retaliation claims.

## II. Burden-Shifting

To establish a prima facie case of retaliation under Title VII, and hence under Title IX, a plaintiff must prove (1) she engaged in a protected activity; (2) she suffered an adverse action; and (3) there was a causal connection between the two. *See Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to set forth a legitimate, nonretaliatory reason for its actions. *See id.* If the defendant sets forth such a reason, the plaintiff bears the ultimate burden of submitting evidence showing that the defendant's proffered reason is merely a pretext for a retaliatory motive. *See Nilsson v. City of Mesa*, 503 F.3d 947, 954 (9th Cir. 2007).

Without accepting the majority's reasoning, I will assume that Emeldi has met the first two elements of a prima facie case — that she engaged in a protected activity and suffered

an adverse action. She has not, however, shown enough to require a jury to decide whether Professor Horner's resignation as her dissertation chair was in retaliation for complaints she made against him (and the University) of gender discrimination. I have trouble seeing how her largely subjective and pervasive speculative interpretations of events are sufficient to make a prima facie case of causation. But even assuming she clears that hurdle, I think the University and Horner have established a legitimate, nondiscriminatory explanation for Horner's resignation and Emeldi's inability to find a replacement chair, and she has failed to present evidence from which a reasonable jury could find it to be mere pretext. *See Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008).

Emeldi complains that Horner resigned as her dissertation chair and also prevented her from finding a replacement so she could complete her Ph.D.[1] He did this, she contends, because she sent a memo to University officials that included a criticism of the underrepresentation of women on the faculty, then later complained to other officials that Horner's treatment of her in class meetings and his supervision of her thesis reflected his own bias against her as a woman. Horner and the University vigorously deny these serious allegations — that Horner was biased against women generally or specifically against Emeldi, and that at the time he resigned he even knew that Emeldi thought he was. The majority concedes this is a close case; but it concludes nonetheless that Emeldi has shown enough to warrant a jury trial. Maj. Op. 12469. I think not. The majority is too generous to Emeldi's "evidence." Notably, almost all of her proof of Horner's gender bias and retaliatory actions is based on her own suspicions and speculation. She may in her own mind have believed her problems were the result of gender bias. The issue, however, is whether Horner was biased, knew she thought that and retaliated

---

[1]The majority's characterization of Horner as having "poisoned his colleagues against her," Maj. Op. 12464, is especially hollow on this record. *See* pp. 12484, *infra*.

against her for saying so. Tellingly, Emeldi has not provided statements from other witnesses who might have corroborated her speculation, particularly on factual issues where one would expect her to have at least tried to find someone who would support her theory of the case. She offers no explanation or excuse — such as faculty or student witnesses who refused to cooperate by providing sworn statements, or the existence of some "code-of-silence."

I acknowledge that this is a summary judgment appeal, and we give substantial leeway to the plaintiff as the losing party below. Nonetheless, it is well-settled that, "[w]hen the non-moving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact." *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) (per curiam); *see also United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) (Gould, J.) ("The evidence adduced by Cafasso establishes only that this set of events could conceivably have occurred; it does not give rise to a reasonable inference that it did in fact occur. To find liability on this evidence would require undue speculation. To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations."); *Head v. Glacier Nw. Inc.*, 413 F.3d 1053, 1059 (9th Cir. 2005) (discussing the "longstanding precedent that conclusory declarations are insufficient to raise a question of material fact").

Emeldi's claims come up short for these very reasons. She seeks to blame her failed Ph.D. dissertation effort on her master professor's gender bias and retaliatory motive, transforming academic judgment calls into a civil rights violation. In this context, I submit there is good reason to insist that the student provide specific and substantial evidence — not just speculation and circumstantial inferences that are not attested to by others and, importantly, are inconsistent with the contemporaneous documentary record.

A brief review of the evidence the majority relies on, and the University's rebuttal, shows why.

1. *May 2007 memo to Bullis*. In May 2007, Emeldi wrote a memo summarizing a meeting between several graduate students and Mike Bullis, the Dean of the College of Education. ER 34-35. That memo, under the heading "Recommendations," listed as one of many topics that had been discussed the following bullet point:

> Students request that qualified women be hired into tenured faculty positions [emphasis]. Students attempted and were unable to identify a current female appointment to a tenured faculty position. Students need to experience empowered female role models successfully working within an academic context [emphasis]. Doctoral students request that the college model a balance of gender appointments that reflect the proportion of student gender population ratios.

SER 56 (brackets and bracketed text in original). This paragraph is the keystone of Emeldi's claim that Horner resigned in retaliation for Emeldi having complained to the University about gender inequality. Horner, however, in uncontradicted testimony states that he was never made aware of the contents of Emeldi's May 2007 memo before he resigned as her chair, learning its contents only during this litigation. *See* SER 5-6, 24. Emeldi has provided no evidence of Horner's actual knowledge of the memo's contents, particularly the gender issue, before then. At most, she offers only uncorroborated hearsay from an unidentified source that all faculty got copies of the memo and, she says, its contents were "common knowledge." Maj. Op. 12454.

2. *Meeting with Friestad and Bentz*. The next critical piece of evidence in Emeldi's attempt to link Horner's resignation to gender discrimination is a meeting she had with University

administrators Marian Friestad and (possibly) Annie Bentz in October 2007. ER 37.[2] Emeldi says that after there had been no response or follow-up to her earlier May memo, she arranged the meeting:

> regarding what I perceived to be relative lack of academic support and related diminishment of financial support . . . to complete my doctoral degree problem. I described one possible cause of that problem as an institutional bias in favor of male doctoral candidates, and a relative lack of support and role models for female candidates. I mentioned the content issues in the Student Advisory Board Memo and my concern about gender inequity of the faculty. *I identified the chair of my dissertation committee, Dr. Rob Horner, as being distant and relatively inaccessible to me.*

ER 28 (emphasis added). This is the whole of Emeldi's proof that sex discrimination was discussed and, more importantly, of her supposed allegation of gender bias against Horner. She then theorizes that Friestad told Horner about Emeldi's allegation, triggering his resignation. Even assuming Emeldi's ambiguous characterization of Horner as being "distant and relatively inaccessible" was meant as an accusation of gender bias, Friestad certainly did not understand that to be the issue. She denies that sex discrimination was discussed at all, much less any accusations of such against Horner. SER 9 at ¶ 4.

Friestad's account is supported by a contemporaneous document that further undermines Emeldi's recollection of the discussion. In connection with the meeting, Emeldi sent Friestad a memo entitled "Reference Information for Requested Conflict Resolution Services," which chronicled what Emeldi obviously found to be a frustrating history with the Special Education Doctoral program from 2004 to October 2007. *See*

---

[2] Neither party has submitted a declaration from Bentz.

Memorandum dated Oct. 18, 2007, dkt. #37-3. The memo detailed perceived slights, lack of cooperation or response and some disagreements or "conflicts" with various faculty members, including Horner in his capacity as chair of her dissertation committee and supervisor of her academic work. As the memo's "Introductory Comments" section states, however, it was "not intended as a criticism of the faculty members discussed. It is intended to describe the series of conflicts that have resulted in communication failures and the events that have contributed to a lack of progress made in my program." Dkt. #37-3 at 14. Friestad says that was her understanding of what the meeting was about, and reflects the nature of what she and Emeldi actually discussed — "what might best be termed as a series of perceived personality conflicts." SER 9 at ¶ 4, SER 10. Critically, Friestad states that "Ms. Emeldi did not discuss any issues related to sexual harassment or discrimination. Nor was there any inference [sic] or indication that she was concerned about sexual harassment or discrimination in the Memorandum." SER 9 at ¶ 4. Reading Emeldi's memo confirms Friestad's account and understanding.

Although the evidence of a nonmoving party is to be believed, and all justifiable inferences are to be drawn in her favor, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), "evidence in opposition to the motion that clearly is without any force is insufficient to raise a genuine issue," 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2727 (3d ed. 2011). Emeldi's "evidence" regarding what took place at the October 19 meeting appears to fall into this category. Even if Emeldi's claim that gender discrimination was discussed is credited, however, Emeldi offers only speculation that Friestad informed Horner of any charges of discrimination following the meeting.

3. *Friestad phone call to Horner.* The next critical link in Emeldi's chain of causation is Friestad's phone call to Horner sometime after the October 19 meeting. With Emeldi's permission, Friestad called Horner to discuss Emeldi's concerns

about her lack of progress in the doctoral program, including Horner's role in the delay. SER 10.[3] Horner acknowledges the phone call "with Marian Friestad in which she informed me that Ms. Emeldi had filed a concern related to her moving forward." SER 20. Freistad did not share with him the contents of any documents; she "simply told me that there was a concern." *Id.* Significantly, Emeldi's counsel did not ask Horner at his deposition whether Friestad mentioned gender bias. And Friestad, as quoted above, denies that she and Emeldi ever discussed gender discrimination at any of their meetings. SER 8-11. On this record, there is no evidence that Horner understood from the phone call that Emeldi's "concerns" about her progress and Horner's role involved gender bias. Equally important, although Horner readily acknowledges that Emeldi's concerns about him ultimately led to his resignation, he said his decision came only after receiving an email memo from Emeldi on November 12, well after Friestad's phone call. SER 20-23.

4. *Emeldi's November 2007 memo/email exchanges with Horner.* Horner attributes his decision to resign as Emeldi's dissertation chair, and his timing, to a November 12 email memo he received from Emeldi, *see* SER 63-68, "identifying me as a barrier to her advancement and indicating that she was concerned about my unwillingness to move her doctoral committee forward"; "she was significantly concerned that I was a barrier to her advancement. That is not a role I am interested in playing, therefore it seemed that the logical step was for her to work with someone who would be able to promote her objectives. I chose to stop being the chair of her dissertation committee." SER 21-23.[4] Horner's description of the

---

[3]Friestad asked Emeldi "at multiple points, including at the end of the meeting, if she wanted [her] to contact Dr. Horner and discuss her concerns about her progress in the doctoral program. Ms. Emeldi gave [her] permission to do so." SER 9-10 at ¶ 5.

[4]He noted that though he "chose to stop being the chair of her dissertation committee," SER 23, he "stayed as her program advisor." SER 21.

lengthy and detailed memo is accurate; and — consistent with Friestad's account of her initial and subsequent meetings with Emeldi — it contains no suggestion of gender discrimination. Emeldi wrote to Horner, "Though support has been requested, and you have acknowledged my patience in waiting for your involvement, we have, to date, not collaborated to progress my dissertation research forward." SER 67. She continued, "The extinction plan that's been implemented over the last year particularly has prevented me from accessing support in weekly research meetings to progress dissertation prerequisite and project work and from directly communicating, accessing support, and collaborating with you, committee, and other faculty members causing my program to be unnecessarily extended." *Id.* On November 19, Horner sent Emeldi the following email in response:

> I am sorry you were unable to come to the research meeting today, because I think it is important for us to resolve the issues you frame in your message without delay. . . . [¶] Your message is clear that you see my feedback as a barrier to your progress, and not helpful in moving your dissertation forward. [¶] I have great respect for your personal and professional judgement and I do not wish to be a barrier to your advancement. [¶] At the same time, I think we have differences in our view of your research plan. [¶] After some serious thought, I believe the most logical move is for you to work with an advisor who is more in tune with your research vision. As such I resign as of today as chair of your dissertation committee.

SER 61-62. Significantly absent from this contemporaneous documentary exchange between Emeldi and Horner (like Emeldi's memo to Friestad) is any hint of gender discrimination being at issue or having been surfaced. *See* SER 20-23; *see also* dkt. #54. Rather, Horner describes the intellectual and interpersonal conflicts that led to his resignation:

> Ms. Emeldi developed a dissertation proposal but was dissatisfied with my critiques about the scope and substance of her proposal. In my judgment Ms. Emeldi's dissertation proposal was insufficiently developed to allow presentation to a dissertation committee. The conceptual foundation was not established, and her methodology would not have met the standards for a doctoral dissertation.

SER 5 at ¶ 2. Horner explains that Emeldi "did not respond well to [my criticisms]. . . . [S]he resisted my suggestions, and went to University administration complaining that I was an obstacle to her progress." SER 5 at ¶ 3.

I submit that, even making allowances for Emeldi's need in some instances to rely on circumstantial evidence, and giving her the benefit of permissible inferences on summary judgment, there is nothing but speculation to supply the vital missing element in Emeldi's gender discrimination claim: that the cause of and true reason for Horner's resignation (and his alleged undermining of finding a replacement chair) was gender-based retaliation. Not only do Horner and Friestad deny it, the documents created at the time corroborate them. *See* Maj. Op. 12466-67. Nonetheless, leveraging off her disputed complaint about Horner's gender bias to Friestad, Emeldi now theorizes that Horner's resignation as her chair had to be because Friestad reported that accusation in her call to Horner. However, when asked why she believed Horner's resignation was "gender based retaliation," she candidly — and correctly — replied, "I would be speculating. I think that's a question for Rob Horner." SER 53. *See* Maj. Op. 12469 & n.8.

The majority, however, believes a jury should decide this question. To justify allowing Emeldi to get that far, it cites three items of "ample circumstantial evidence" to establish causation and pretext. Maj. Op. 12464. The first and "strong" circumstance is the proximity in time between Emeldi's pro-

tected conduct — her assumed complaint of gender discrimination — and Horner's resignation. Maj. Op. 12462 (citing *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1035 (9th Cir. 2006)). Of course, in *Cornwell* we held "the record did not contain evidence that Sharp knew about Cornwell's complaint before Sharp demoted him, and thus Cornwell's complaint could not have caused Cornwell's demotion." *Cornwell*, 439 F.3d at 1035. Likewise, that is the record here. Emeldi has no evidence that Horner had any idea she was accusing him of gender discrimination.

To close this evidentiary gap, the majority credits Emeldi's "theory" on appeal of how Horner learned of her supposed gender-bias complaints about him. In her brief to this court, Emeldi speculates that "[a]s soon as [she] left the discussion with Friestad, [Friestad] called Horner and told him that [Emeldi] had accused him of discriminating against her." Bl. Br. 6. She contends that because of that contact, Horner resigned as her dissertation chair "that very day." Bl. Br. 23. In fact, events did not move anywhere near that fast.[5] As documented by the record, Horner resigned on November 19, after receiving Emeldi's long email memo on November 12. *See* SER 21. As noted above, the Emeldi-Friestad meeting was on October 19, with the Friestad-Horner phone call occurring shortly after. The evidence shows that almost a month intervened between the call and Horner's resignation, during which time Horner and Emeldi had rather extensive email contacts, providing a contemporaneous documentary record that confirms Horner's nonpretextual explanation for his resignation.

Regardless of the timeline, Horner does not dispute that he resigned because of Emeldi's complaints about delays in her dissertation's progress — as relayed in general terms by Friestad and supplemented by Emeldi's email memo. But he does

---

[5]Emeldi's counsel's willingness to exaggerate the documented facts undermines the credibility of counsel and his client.

dispute — and there is no credible objective evidence to the contrary — that his resignation had anything to do with her being a woman rather than a grad student who had come to view him as a "barrier to her advancement." SER 21.

The majority tries to bolster Emeldi's case by citing to Horner's supposed acts of gender bias "in other contexts," all of which are anecdotal, based largely on hearsay and unsupported other than by Emeldi's own accounts. Maj. Op. 12453-54, 12464. For example, the majority credits Emeldi's assertion "that Horner gave more attention and support to male students and that he ignored her and did not make eye contact with her." Maj. Op. 12464.[6]

The majority also credits Emeldi's complaint that when she attended Horner's graduate student group meetings, she was "not on the agenda," or when she was on the agenda, none of her "substantial/meaningful work" was discussed. Maj. Op. 12464. Once again, there is no proffered testimony of other students or faculty members to give credence to Emeldi's perceptions that Horner was slighting her (and presumably other women students). The majority excuses this shortcoming because Emeldi "had direct percipient knowledge of what happened at the graduate student group meetings she attended." Op. at 12466 n.7. But this misses the point. She and the majority rely on these "facts" to prove Horner's actual gender-biased behavior — discrimination that took place not in one-on-one dealings between Horner and Emeldi where it would have to be a "he said, she said" dispute, but in front of many potential witnesses. Summary judgment standards do not require us to turn a blind eye to Emeldi's failure to make her affirmative case or to rebut the defendants' nonpretextual explanations with anything other than her own characterizations and perceptions.

---

[6]The majority cites only Emeldi's own speculative statement of facts in opposition to the University's motion for summary judgment, ER 36, and her statements in the Notice of Grievance, dkt. #53 at 27-28, which she filed against Horner on January 16, 2008, two months after his resignation.

This failure is particularly troubling with respect to what the majority invokes as Emeldi's "specific examples of Horner's male students being given opportunities that were not available to his female students," such as access to office space and technology. Maj. Op. 12464. The majority refers only to Emeldi's declaration; Emeldi cites nothing at all. She describes favorable treatment given to four specified male students, and names a female professor and a female student, both of whom she says complained of "subordinating" and "derogatory" treatment resulting from this disparity. Dkt. #74 at 16-18. She also says these disparities were "observed by doctoral students interviewed for the Student Advisory Board Memo." *Id*. at 16. But she does not offer declarations from any of these sources, or any direct evidence of Jason Naranjo's premature "assist[ance] to get a tenure-track position," Scott Ross' "three office spaces" and "number of palm pilots" or Scott Yamamoto's "several opportunities to work on research projects." *Id.* at 16-17. This evidence, which Emeldi has not bothered to corroborate, is too anecdotal and lacking in specific evidentiary support to raise any reasonable inference that Horner was gender biased and actively discriminated between his male and female students.

Perhaps the most glaring example of Emeldi's speculative accusations, credited by the majority as supportive "other evidence" of Horner's retaliatory intent, Maj. Op. 12464, relates to her inability to secure a replacement chair despite asking 15 faculty members — which she attributes to Horner's gender-based animus against her. The majority cites Emeldi's contention that after his resignation, Horner "told other Department faculty members that Emeldi should not be granted a Ph.D., and should instead be directed into the Ed.D. program, which Emeldi says is a less prestigious degree." Maj. Op. 12456.

Other than Emeldi's own speculation and hearsay, neither of which can establish a disputed issue of material fact, the evidence that this statement was made is nonexistent. The "evidence" is actually the excerpt of record Emeldi submitted

in this appeal (ER 37-38), which in turn is the statement of facts Emeldi submitted in opposition to the University's summary judgment motion in the district court. There Emeldi stated: "Horner announced to other faculty . . . that plaintiff should not be granted a Ph.D. degree but should be directed into a program for the lesser Ed.D. degree. Horner has never discussed that change with plaintiff." ER 37-38. As support, she cites to her own declaration, in which she alleges, "[there was a] November 27, 2007 faculty meeting in which [Horner] advocated that I obtain a[ ] D.Ed. rather than a Ph.D. . . . Professor Cindy Herr described this statement by Horner to me immediately after it occurred, but I had never heard such a suggestion previously from Horner or anyone else." Dkt. #54 at 8. Where is the corroboration from Cindy Herr? All we have is a two-page excerpt of Herr's deposition. *See* dkt. #56-2. Nowhere does Herr testify that Horner made these statements, nor does she testify that she told Emeldi that Horner made these statements. Indeed, nothing in Herr's excerpted testimony refers to the Ed.D. program, a faculty meeting or even Horner at all. Emeldi's failure to ask Herr to confirm her alleged statement to Emeldi discredits the accusation against Horner as completely unfounded and certainly not "material to Emeldi's retaliation claim."

I am sympathetic to the majority's belief that the University could have done more for Emeldi in helping her find a replacement. *See* Maj. Op. 12456. That does not establish gender discrimination as the motivation for Horner's actions or the University's shortcomings, however. To posit, as the majority does, that she was unable to secure a replacement chair because Horner "poisoned" his colleagues against her is simply not credible on this record. Maj. Op. 12464. Not only has Emeldi failed to support Herr's alleged statement, she has presented no evidence from (or about) any of the 15 faculty members she asked, or from anyone else, suggesting that Horner did anything to dissuade them from acting as her chair. Rather, emails she placed in the record show that those she asked declined for a number of legitimate reasons: they

did not believe they had the appropriate specialization to oversee her research; they were already overextended with other projects; they were ineligible to serve as chairs due to University policies. One was hesitant to make a commitment due to health issues. One had moved to Kansas. Another was retired. *See* dkt. #48 at 16-26. Further, these emails show that many of the faculty members offered to meet with her to discuss her project, and then wished her well when they determined they were unable to serve as her chair. Some referred her to other faculty members, and several volunteered to serve on her dissertation committee. These are not responses one would expect from colleagues who had been "poisoned." And equally notable, as the majority concedes, "the record does not disclose why, despite unsuccessfully soliciting fifteen faculty members, Emeldi overlooked two professors who, the University says, were qualified and available to replace Horner as Emeldi's dissertation chair." Maj. Op. 12469.

Finally, the majority uses Horner's earlier praise for Emeldi's work as evidence that his explanation for resignation is pretextual. *See* Maj. Op. 12464. To do so seems a pure Catch 22. Had Horner never praised Emeldi, undoubtedly she (and the majority) would cite that as evidence of his long-standing, persistent gender bias. Horner praised Emeldi's work at various points in their relationship, but he also critiqued her work, as the majority itself notes. *See* Maj. Op. 12455 n.1, 12463 n.5. One would expect nothing less from a dissertation committee chair. Part of the chair's role is to offer the student advice and criticism on her dissertation's weaknesses as well as strengths, as well as on her own academic performance. That Horner did just that does not show that his stated reason for resigning as her advisor after she told him he was "a barrier to her advancement" was pretextual. SER 21.[7]

---

[7]In his declaration, Horner describes criticism he gave Emeldi leading up to his resignation: "In my judgment Ms. Emeldi's dissertation proposal was insufficiently developed to allow presentation to a dissertation committee. The conceptual foundation was not established, and her methodol--

In sum, Emeldi's case should fail because she has not shown enough to warrant a jury's finding causation. But even if we give her the benefit of doubt on that requirement, she *certainly has not shown enough to rebut as mere pretext Horner's reason for resigning as her dissertation chair.* The evidence, including Friestad and Horner's testimony and Emeldi's own documented complaints, makes it clear that Horner's nondiscriminatory explanation was genuine: he resigned as dissertation chair because of intellectual and interpersonal incompatabilities with his Ph.D. candidate. Emeldi's unsupported statements and speculation do not overcome this evidence, and she has not offered corroborative evidence that was available to her that would create triable issues of causation and pretext. We should not allow this case to go forward.

Title IX's worthy antidiscrimination objectives notwithstanding, to let Ms. Emeldi's claims go to a jury will serve only as a precedent-setting example of how little it takes to turn a failed supervisory relationship between a professor and his Ph.D. candidate into a federal case of gender discrimination. The district court properly granted summary judgment. I respectfully dissent.

---

ogy would not have met the standards for a doctoral dissertation. I pointed these and other issues out to her in a memo I wrote to her on September 7, 2009 . . . . I informed her that she was not yet ready to call her dissertation committee together because her proposal was not yet functional." SER 5 at ¶ 2.