**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| VERONICA OLLIER; NAUDIA RANGEL, by her next friends Steve and Carmen Rangel; MARITZA RANGEL, by her next friends Steve and Carmen Rangel; AMANDA HERNANDEZ, by her next friend Armando Hernandez; ARIANNA HERNANDEZ, by her next friend Armando Hernandez, individually and on behalf of all those similarly situated,<br><br>*Plaintiffs-Appellees*,<br><br>v.<br><br>SWEETWATER UNION HIGH SCHOOL DISTRICT; ARLIE N. RICASA; PEARL QUINONES; JIM CARTMILL; JAIME MERCADO; GREG R. SANDOVAL; JESUS M. GANDARA; EARL WEINS; RUSSELL MOORE, in their official capacities,<br><br>*Defendants-Appellants*. | No. 12-56348<br><br>D.C. No. 3:07-cv-00714-L-WMC<br><br><br>OPINION |

Appeal from the United States District Court
for the Southern District of California
M. James Lorenz, Senior District Judge, Presiding

Argued and Submitted
June 3, 2014—Pasadena, California

Filed September 19, 2014

Before: Ronald M. Gould and N.R. Smith, Circuit Judges,
and Morrison C. England, Jr., Chief District Judge.[*]

Opinion by Judge Gould

## SUMMARY[**]

### Civil Rights

The panel affirmed the district court's judgment granting
declaratory and injunctive relief to plaintiffs in a class action
suit brought in part pursuant to Title IX of the Education
Amendments of 1972, alleging (1) unequal treatment and
benefits in athletic programs; (2) unequal participation
opportunities in athletic programs; and (3) retaliation.

The panel held that Sweetwater Union High School
District and its administrators and board members did not
fully and effectively accommodate the interests and abilities
of female athletes and therefore the district court did not err

---

[*] The Honorable Morrison C. England, Jr., Chief District Judge for the
U.S. District Court for the Eastern District of California, sitting by
designation.

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

in its award of summary judgment and injunctive relief to plaintiffs on their Title IX unequal participation claim.

The panel held that the district court did not abuse its discretion by: (1) striking the proposed testimony of Sweetwater's two experts because the record suggested that the testimony  was based on, at best, an unreliable methodology; (2) excluding Sweetwater's 38 untimely disclosed witnesses from testifying at trial because Sweetwater's failure to comply with Fed. R. Civ. P. 26's disclosure requirement was neither substantially justified nor harmless; and (3) declining to consider contemporaneous evidence at trial.

The panel held that the student plaintiffs had Article III standing to bring their Title IX retaliation claim arising from the firing of the softball coach.  The panel further determined that the district court did not clearly err when it found that: (1) plaintiffs established a prima facie case of Title IX retaliation; and (2) Sweetwater's purported non-retaliatory reasons for firing the coach were pretextual excuses for unlawful retaliation. The panel held, therefore, that the district court did not abuse its discretion by granting permanent injunctive relief to plaintiffs on their Title IX retaliation claim.

---

## COUNSEL

Paul V. Carelli, IV (argued), Daniel R. Shinoff, and Patrice M. Coady, Stutz Artiano Shinoff & Holtz, APC, San Diego, California, for Defendants-Appellants.

Elizabeth Kristen (argued), Robert Borton, and Kim Turner, Legal Aid Society Employment Law Center, San Francisco, California; Vicky L. Barker and Cacilia Kim, California Women's Law Center, Los Angeles, California; Joanna S. McCallum and Erin Witkow, Manatt, Phelps & Phillips, LLP, Los Angeles, California, for Plaintiffs-Appellees.

Erin H. Flynn (argued), United States Department of Justice, Civil Rights Division, Appellate Section; Philip H. Rosenfelt, Deputy General Counsel; Thomas E. Perez, Assistant Attorney General; Vanessa Santos, United States Department of Education Office of the General Counsel; Dennis J. Dimsey and Holly A. Thomas, United States Department of Justice, Civil Rights Division, Appellate Section, for Amicus Curiae United States of America.

Fatima Goss Graves, Neena K. Chaudhry, and Valarie Hogan, National Women's Law Center, Washington, D.C.; Lauren B. Fletcher and Anant K. Saraswat, Wilmer, Cutler, Pickering, Hale & Dorr LLP, Boston, Massachusetts; Megan Barbero, Dina B. Mishra, and Brittany Blueitt Amadi, Wilmer, Cutler, Pickering, Hale & Dorr LLP, Washington, D.C., for Amicus Curiae National Women's Law Center, et al.

Kristen Galles, Equity Legal, Alexandria, Virginia; Nancy Hogshead-Makar, Women's Sports Foundation, Jacksonville, Florida, for Amicus Curiae Women's Sports Foundation, et al.

**OPINION**

GOULD, Circuit Judge:

Defendants-Appellants Sweetwater Union High School District and eight of its administrators and board members (collectively "Sweetwater") appeal the district court's grant of declaratory and injunctive relief to Plaintiffs-Appellees Veronica Ollier, Naudia Rangel, Maritza Rangel, Amanda Hernandez, and Arianna Hernandez (collectively "Plaintiffs") on Title IX claims alleging (1) unequal treatment and benefits in athletic programs;[1] (2) unequal participation opportunities in athletic programs; and (3) retaliation. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

**I**

On April 19, 2007, Plaintiffs filed a class action complaint against Sweetwater alleging unlawful sex discrimination under Title IX of the Education Amendments of 1972 ("Title IX"), *see* 20 U.S.C. § 1681 *et seq.*, and the Equal Protection Clause of the Fourteenth Amendment, *see* 42 U.S.C. § 1983.[2]  They alleged that Sweetwater "intentionally discriminated" against female students at Castle Park High School ("Castle Park") by "unlawfully fail[ing] to provide female student athletes equal treatment

---

[1] Neither of Sweetwater's briefs on appeal includes argument on Plaintiffs' unequal treatment and benefits claim. Thus, Sweetwater has waived its appeal on that claim. *See Hall v. City of L.A.*, 697 F.3d 1059, 1071 (9th Cir. 2012).

[2] Plaintiffs' 42 U.S.C. § 1983 sex-based discrimination claim dropped out of the case in July 2010, when the district court severed it from the Title IX claims upon agreement of the parties.

and benefits as compared to male athletes." They said that female student athletes did not receive an "equal opportunity to participate in athletic programs," and were "deterred from participating" by Sweetwater's "repeated, purposeful, differential treatment of female students at Castle Park." Plaintiffs alleged that Sweetwater ignored female students' protests and "continued to unfairly discriminate against females despite persistent complaints by students, parents and others."

Specifically, Plaintiffs accused Sweetwater of "knowingly and deliberately discriminating against female students" by providing them with inequitable (1) practice and competitive facilities; (2) locker rooms and related storage and meeting facilities; (3) training facilities; (4) equipment and supplies; (5) transportation vehicles; (6) coaches and coaching facilities; (7) scheduling of games and practice times; (8) publicity; (9) funding; and (10) athletic participation opportunities. They also accused Sweetwater of not properly maintaining the facilities given to female student athletes and of offering "significantly more participation opportunities to boys than to girls[.]" Citing Sweetwater's "intentional and conscious failure to comply with Title IX," Plaintiffs sought declaratory and injunctive relief under 20 U.S.C. § 1681 *et seq.* for three alleged violations of Title IX: (1) unequal treatment and benefits in athletic programs; (2) unequal participation opportunities in athletic programs; and (3) retaliation.[3]

---

[3] Plaintiffs' retaliation claim was premised on (1) the July 2006 firing of Chris Martinez, "a highly qualified and well-loved softball coach," which occurred shortly after Castle Park received a formal Title IX complaint; (2) a ban on a parent-run snack stand during softball games; and (3) a ban on parental assistance in softball coaching.

## A

In July 2008, Plaintiffs moved for partial summary judgment on their Title IX claim alleging unequal participation opportunities in athletic programs. Sweetwater conceded that "female athletic participation" at Castle Park was "lower than overall female enrollment," but argued that the figures were "substantially proportionate" for Title IX compliance purposes, and promised to "continue to strive to lower the percentage." As evidence, Sweetwater noted that there are "more athletic sports teams for girls (23) than . . . for boys (21)" at Castle Park.

The district court gave summary judgment to Plaintiffs on their unequal participation claim in March 2009. *See Ollier v. Sweetwater Union High Sch. Dist.*, 604 F. Supp. 2d 1264 (S.D. Cal. 2009). The court found that "substantial proportionality requires a close relationship between athletic participation and enrollment," and concluded that Sweetwater had not shown such a "close relationship" because it "fail[ed] to provide female students with opportunities to participate in athletics in substantially proportionate numbers as males." *Id.* at 1272. Rejecting one of Sweetwater's arguments, the district court reasoned that it is the "actual number and the percentage of females participating in athletics," not "the number of teams offered to girls," that is "the ultimate issue" when evaluating participation opportunities. *Id.* After finding that Plaintiffs had met their burden on each prong of the relevant Title IX compliance test, the district court determined that Sweetwater "failed to fully and effectively accommodate female athletes and potential female athletes" at Castle Park, and that it was "not in compliance with Title IX based on unequal participation opportunities in [the] athletic program." *Id.* at 1275; *see Neal v. Bd. of Trs. of Cal.*

*State Univs.*, 198 F.3d 763, 767–68 (9th Cir. 1999) (laying out the three-prong test for determining whether a school has provided equal opportunities to male and female students).

**B**

Before trial, the district court decided three other matters at issue in this appeal.  First, it granted Plaintiffs' motion to exclude the testimony of two Sweetwater experts because (1) the experts' conclusions and opinions "fail[ed] to meet the standard of Federal Rule of Evidence 702" because they were based on "personal opinions and speculation rather than on a systematic assessment of [the] athletic facilities and programs" at Castle Park, and (2) the experts' methodology was "not at all clear."

Second, it granted Plaintiffs' motion to exclude 38 of Sweetwater's witnesses because they were not timely disclosed, reasoning that "[w]aiting until long after the close of discovery and on the eve of trial to disclose allegedly relevant and non-cumulative witnesses is harmful and without substantial justification."  Because Sweetwater "offered no justification for [its] failure to comply with" Federal Rule of Civil Procedure 26(a) and (e), the district court concluded that exclusion of the 38 untimely disclosed witnesses was "an appropriate sanction" under Federal Rule of Civil Procedure 37(c)(1).

Third, it considered Sweetwater's motion to strike Plaintiffs' Title IX retaliation claim as if it were a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss that claim, and denied it on the merits.  *See Ollier v. Sweetwater Union High Sch. Dist.*, 735 F. Supp. 2d 1222 (S.D. Cal. 2010).  In so doing, the district court determined that

Plaintiffs had standing to bring their Title IX retaliation claim—a claim the court viewed as premised on harm to the class, not harm to the softball coach whose firing Plaintiffs alleged was retaliatory. *See id.* at 1226 ("Plaintiffs . . . have set forth actions taken against the plaintiff class members after they complained of sex discrimination that are concrete and particularized."). The district court also concluded that Plaintiffs' retaliation claim was not moot after finding that class members were still suffering the effects of Sweetwater's retaliatory conduct and that Sweetwater's actions had caused a "chilling effect on students who would complain about continuing gender inequality in athletic programs at the school." *Id.* at 1225.

## C

After a 10-day bench trial, the district court granted Plaintiffs declaratory and injunctive relief on their Title IX claims alleging (1) unequal treatment of and benefits to female athletes at Castle Park, and (2) retaliation. *See Ollier v. Sweetwater Union High Sch. Dist.*, 858 F. Supp. 2d 1093 (S.D. Cal. 2012).

The district court concluded that Sweetwater violated Title IX by failing to provide equal treatment and benefits in nine different areas, including recruiting, training, equipment, scheduling, and fundraising. *Id.* at 1098–1108, 1115. Among other things, the district court found that female athletes at Castle Park were supervised by overworked coaches, provided with inferior competition and practice facilities, and received less publicity than male athletes. *Id.* at 1099–1104, 1107. The district court found that female athletes received unequal treatment and benefits as a result of "systemic administrative failures" at Castle Park, and that Sweetwater

failed to implement "policies or procedures designed to cure the myriad areas of general noncompliance with Title IX." *Id.* at 1108.

The district court also ruled that Sweetwater violated Title IX when it retaliated against Plaintiffs by firing the Castle Park softball coach, Chris Martinez, after the father of two of the named plaintiffs complained to school administrators about "inequalities for girls in the school's athletic programs." *Id.* at 1108; *see id.* at 1115. The district court found that Coach Martinez was fired six weeks after the Castle Park athletic director told him he could be fired at any time for any reason—a comment the coach understood to be a threat that he would be fired "if additional complaints were made about the girls' softball facilities." *Id.* at 1108.

Borrowing from "Title VII cases to define Title IX's applicable legal standards," the district court concluded (1) that Plaintiffs engaged in protected activity when they complained to Sweetwater about Title IX violations and when they filed their complaint; (2) that Plaintiffs suffered adverse actions—such as the firing of their softball coach, his replacement by a less experienced coach, cancellation of the team's annual awards banquet in 2007, and being unable to participate in a Las Vegas tournament attended by college recruiters—that caused their "long-term and successful softball program" to be "significantly disrupted"; and (3) that a causal link between their protected conduct and Sweetwater's retaliatory actions could "be established by an inference derived from circumstantial evidence"—in this case, "temporal proximity." *Id.* at 1113–14. Finally, the district court rejected Sweetwater's non-retaliatory reasons for firing Coach Martinez, concluding that they were "not credible and are pretextual." *Id.* at 1114. The district court

determined that Sweetwater's suggested non-retaliatory justifications were *post hoc* rationalizations for its decision to fire Coach Martinez—a decision the district court said was impermissibly retaliatory.  *See id.*

### D

Sweetwater timely appealed the district court's decisions (1) to grant partial summary judgment to Plaintiffs on their Title IX unequal participation claim; (2) to grant Plaintiffs' motions to exclude expert testimony and 38 untimely disclosed witnesses; (3) to deny Sweetwater's motion to strike Plaintiffs' Title IX retaliation claim; and (4) to grant a permanent injunction to Plaintiffs on their Title IX claims, including those alleging (a) unequal treatment of and benefits to female athletes at Castle Park, and (b) retaliation.[4]

### II

We review *de novo* a district court's grant of a motion for summary judgment to determine whether, viewing the evidence in the light most favorable to the nonmoving party, there exists a genuine dispute as to any material fact and whether the district court correctly applied the substantive law.  *See* Fed. R. Civ. P. 56(a); *Cameron v. Craig*, 713 F.3d 1012, 1018 (9th Cir. 2013).

---

[4] Sweetwater also gave notice of its intent to appeal the district court's decision to certify the Plaintiffs' proposed class.  However, neither of Sweetwater's briefs on appeal includes argument on the district court's decision to grant class certification.  Sweetwater's appeal on that issue is waived.  *See Hall*, 697 F.3d at 1071.

Title IX of the Education Amendments of 1972 states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX's implementing regulations require that schools provide "equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). Among the factors we consider to determine whether equal opportunities are available to male and female athletes is "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." *Id.* § 106.41(c)(1). In 1979, the Office of Civil Rights of the Department of Health, Education, and Welfare—the precursor to today's Department of Health & Human Services and Department of Education—published a "Policy Interpretation" of Title IX setting a three-part test to determine whether an institution is complying with the "effective accommodation" requirement:

> (1) Whether . . . participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or
>
> (2) Where the members of one sex have been and are underrepresented among . . . athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

> (3) Where the members of one sex are underrepresented among . . . athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

*See* 44 Fed. Reg. 71,413, 71,418 (Dec. 11, 1979). We have adopted this three-part test, which by its terms provides that an athletics program complies with Title IX if it satisfies any one of the above conditions. *See Neal*, 198 F.3d at 767–68.[5]

## A

Sweetwater contends that the district court erred in granting summary judgment to Plaintiffs on their Title IX unequal participation claim because (1) there is "overall proportionality between the sexes" in athletics at Castle Park; (2) Castle Park "expanded the number of athletic teams for female participation over a 10-year period"; (3) "the trend over 10 years showed increased female participation in sports" at Castle Park; and (4) Castle Park "accommodated express female interest" in state-sanctioned varsity sports. Relatedly, Sweetwater argues that there was insufficient interest among female students to sustain viable teams in field hockey, water polo, or tennis.

---

[5] We give deference to the Department of Education's guidance according to *Chevron USA v. Natural Resources Defense Council*, 467 U.S. 837, 843–44 (1984). *See Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 965 n.9 (9th Cir. 2010).

Plaintiffs, on the other hand, contend that (1) the number of female athletes at Castle Park has consistently lagged behind overall female enrollment at the school—that is, the two figures are not "substantially proportionate"; (2) the number of *teams* on which girls could theoretically participate is irrelevant under Title IX, which considers only the number of female *athletes*; and (3) "girls' interest and ability were not slaked by existing programs."

The United States as *amicus curiae* sides with Plaintiffs and urges us to affirm the district court's award of summary judgment. The Government says that the district court "properly analyzed" Castle Park's athletic program under the three-part "effective accommodation" test, and that it correctly concluded that Sweetwater "failed to provide nondiscriminatory athletic participation opportunities to female students" at Castle Park. The Government's position rejects Sweetwater's argument that Title IX should be applied differently to high schools than to colleges, as well as the idea that the district court's "substantial proportionality" evaluation was flawed.[6] We agree with the Government that the three-part test applies to a high school. This is suggested by the Government's regulations, *See* 34 C.F.R. § 106.41(a) (disallowing sex discrimination "in any interscholastic, intercollegiate, club or intramural athletics"), and, accordingly, apply the three-part "effective accommodation" test here. Although this regulation does not explicitly refer to high schools, it does not distinguish between high schools and

---

[6] On appeal, Sweetwater propounds a new theory that, with respect to the first prong of the "effective accommodation" test, "the idea of proportionality relies on percentages, rather than absolute numbers." The Government calls this theory, which has no precedential support, "flatly incorrect."

other types of interscholastic, club or intramural athletics. We give *Chevron* deference to this regulation.  *See* note 5, supra.  *See also McCormick ex rel. McCormick v. School Dist. of Mamaroneck*, 370 F.3d 275, 300 (2d Cir. 2004) (applying three-part test to high school districts); *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 272–75 (6th Cir. 1994) (same).

## B

In 1996, the Department of Education clarified that our analysis under the first prong of the Title IX "effective accommodation" test—that is, our analysis of whether "participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments," 44 Fed. Reg. at 71,418—"begins with a determination of the number of participation opportunities afforded to male and female athletes."  Office of Civil Rights, U.S. Dep't of Educ., *Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test* (Jan. 16, 1996) ("1996 Clarification").  In making this determination, we count only "actual athletes," not "unfilled slots," because Title IX participation opportunities are "real, not illusory."  Letter from Norma V. Cantú, Assistant Sec'y for Civil Rights, Office of Civil Rights, U.S. Dep't of Educ., to Colleagues (Jan. 16, 1996) ("1996 Letter").

The second step of our analysis under the first prong of the three-prong test is to consider whether the number of participation opportunities—*i.e.*, athletes—is substantially proportionate to each sex's enrollment.  *See* 1996 Clarification; *see also Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 94 (2d Cir. 2012).  Exact proportionality is not required, and there is no "magic number at which substantial

proportionality is achieved." *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 110 (4th Cir. 2011); *see also* 1996 Clarification.    Rather, "substantial proportionality is determined on a case-by-case basis in light of 'the institution's specific circumstances and the size of its athletic program.'" *Biediger*, 691 F.3d at 94 (quoting 1996 Clarification).[7]    As a general rule, there is substantial proportionality "if the number of additional participants . . . required for exact proportionality 'would not be sufficient to sustain a viable team.'" *Id.* (quoting 1996 Clarification).

Between 1998 and 2008, female enrollment at Castle Park ranged from a low of 975 (in the 2007–2008 school year) to a high of 1133 (2001–2002).  Male enrollment ranged from 1128 (2000–2001) to 1292 (2004–2005).  Female athletes ranged from 144 (1999–2000 and 2003–2004) to 198 (2002–2003), while male athletes ranged from 221 (2005–2006) to 343 (2004–2005).  Perhaps more helpfully stated, girls made up 45.4–49.6 percent of the student body at Castle Park but only 33.4–40.8 percent of the athletes from 1998 to 2008.  At no point in that ten-year span was the disparity between the percentage of female athletes and the percentage of female students less than 6.7 percent.  It was less than 10 percent in only three years, and at least 13 percent in five years.  In the three years at issue in this

---

[7] An institution that sought to explain a disparity from substantial proportionality should show how its specific circumstances justifiably explain the reasons for the disparity as being beyond its control.

lawsuit, the disparities were 6.7 percent (2005–2006), 10.3 percent (2006–2007), and 6.7 percent (2007–2008).[8]

There is no question that exact proportionality is lacking at Castle Park. Sweetwater concedes as much. Whether there is substantial proportionality, however, requires us to look beyond the raw numbers to "the institution's specific circumstances and the size of its athletic program." 1996 Clarification. Instructive on this point is the Department of Education's guidance that substantial proportionality generally requires that "the number of additional participants . . . required for exact proportionality" be insufficient "to sustain a viable team." *Biediger*, 691 F.3d at 94 (internal quotation marks omitted).

At Castle Park, the 6.7 percent disparity in the 2007–2008 school year was equivalent to 47 girls who would have played sports if participation were exactly proportional to enrollment and no fewer boys participated.[9] As the district court noted, 47 girls can sustain at least one viable competitive team.[10] Defendants failed to raise more than a conclusory assertion

---

[8] That there are "more athletic sports teams for girls (23) than . . . for boys (21)" at Castle Park is not controlling. We agree with Plaintiffs that counting "sham girls' teams," like multiple levels of football and wrestling, despite limited participation by girls in those sports, is "both misleading and inaccurate." It is the number of female athletes that matters. After all, Title IX "participation opportunities must be real, not illusory." 1996 Letter.

[9] In 2005–2006 (6.7 percent; 48 girls) and 2006–2007 (10.3 percent; 92 girls), the disparity was even greater.

[10] The Department of Education says only that a 62-woman gap would likely preclude a finding of substantial proportionality, but that a six-woman gap would likely not. 1996 Clarification.

that the specific circumstances at Castle Park explained the 6.7% disparity between female participation opportunities and female enrollment, or that Castle Park could not support a viable competitive team drawn from the 47 girls. As a matter of law, then, we conclude that female athletic participation and overall female enrollment were not "substantially proportionate" at Castle Park at the relevant times.

## C

Participation need not be substantially proportionate to enrollment, however, if Sweetwater can show "a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of" female athletes. 44 Fed. Reg. at 71,418; *see also Neal*, 198 F.3d at 767–68. This second prong of the Title IX "effective accommodation" test "looks at an institution's past and continuing remedial efforts to provide nondiscriminatory participation opportunities through program expansion." 1996 Clarification. The Department of Education's 1996 guidance is helpful: "There are no fixed intervals of time within which an institution must have added participation opportunities. Neither is a particular number of sports dispositive. Rather, the focus is on whether the program expansion was responsive to developing interests and abilities of" female students. *Id.* The guidance also makes clear that an institution must do more than show a *history* of program expansion; it "must demonstrate a continuing (*i.e.*, present) practice of program expansion as warranted by developing interests and abilities." *Id.*

Sweetwater contends that Castle Park has increased the number of teams on which girls can play in the last decade,

showing evidence of the kind "history and continuing practice of program expansion" sufficient to overcome a lack of "substantial proportionality" between female athletic participation and overall female enrollment.    But Sweetwater's methodology is flawed, and its argument misses the point of Title IX.  The number of *teams* on which girls could theoretically participate is not controlling under Title IX, which focuses on the number of female *athletes*.  *See Mansourian*, 602 F.3d at 969 ("The [Prong] Two analysis focuses primarily . . . on increasing the number of women's athletic opportunities rather than increasing the number of women's teams.").

The number of female athletes at Castle Park has varied since 1998, but there were more girls playing sports in the 1998–1999 school year (156) than in the 2007–2008 school year (149).  The four most recent years for which we have data show that a graph of female athletic participation at Castle Park over time looks nothing like the upward trend line that Title IX requires.  The number of female athletes shrank from 172 in the 2004–2005 school year to 146 in 2005–2006, before growing to 174 in 2006–2007 and shrinking again to 149 in 2007–2008.  As Plaintiffs suggest, these "dramatic ups and downs" are far from the kind of "steady march forward" that an institution must show to demonstrate Title IX compliance under the second prong of the three-part test.  We conclude that there is no "history and continuing practice of program expansion" for women's sports at Castle Park.

**D**

Female athletic participation is not substantially proportionate to overall female enrollment at Castle Park. And there is no history or continuing practice of program

expansion for women's sports at the school. And yet, Sweetwater can still satisfy Title IX if it proves "that the interests and abilities of" female students "have been fully and effectively accommodated by the present program." 44 Fed. Reg. at 71,418; *see also Neal*, 198 F.3d at 767–68. This, the third prong of the Title IX "effective accommodation" test, considers whether a gender imbalance in athletics is the product of impermissible discrimination or merely of the genders' varying levels of interest in sports. *See* 1996 Clarification. Stated another way, a school where fewer girls than boys play sports does not violate Title IX if the imbalance is the result of girls' lack of interest in athletics.

The Department of Education's 1996 guidance is again instructive: In evaluating compliance under the third prong, we must consider whether there is (1) "unmet interest in a particular sport"; (2) ability to support a team in that sport; and (3) a "reasonable expectation of competition for the team." *Id.* Sweetwater would be Title IX-compliant unless all three conditions are present. *See id.* Finally, if an "institution has recently eliminated a viable team," we presume "that there is sufficient interest, ability, and available competition to sustain" a team in that sport absent strong evidence that conditions have changed. *Id.*; *see also Cohen v. Brown Univ.*, 101 F.3d 155, 180 (1st Cir. 1996).

Sweetwater contends that (1) Plaintiffs were required to, but did not, conduct official surveys of female students at Castle Park to gauge unmet interest; (2) field hockey is irrelevant for Title IX purposes because it is not approved by the California Interscholastic Federation ("CIF"); and (3) in any event, field hockey was eliminated only because interest in the sport waned.

Sweetwater's arguments are either factually wrong or without legal support.  First,  Title IX plaintiffs need not themselves gauge interest in any particular sport.  It is the school district that should evaluate student interest "periodically" to "identify in a timely and responsive manner any developing interests and abilities of the underrepresented sex."  1996 Clarification.  Second, field hockey *is* a CIF-approved sport.[11]   But even if it were not, Sweetwater's position is foreclosed by Title IX's implementing regulations, which state that compliance "is not obviated or alleviated by any rule or regulation of any organization, club, athletic or other league, or association."  34 C.F.R. § 106.6(c); *see also Biediger*, 691 F.3d at 93–94 (noting that we are to determine whether a particular "activity qualifies as a sport by reference to several factors relating to 'program structure and administration' and 'team preparation and competition'" (quoting Letter from Stephanie Monroe, Assistant Sec'y for Civil Rights, Office of Civil Rights, U.S. Dep't of Educ., to Colleagues (Sept. 17, 2008))).  Third, the record makes clear that Castle Park cut its field hockey team not because interest in the sport waned, but because it was unable to find a coach. And the school's inability to hire a coach does not indicate lack of student interest in the sport.

Castle Park offered field hockey from 2001 through 2005, during which time the team ranged in size from 16 to 25 girls. It cut the sport before the 2005–2006 school year before offering it again in 2006–2007.  It then cut field hockey a second time before the 2007–2008 school year.   The Department of Education's guidance is clear on this point: "If

---

[11]  *See  Field  Hockey*, Cal. Interscholastic Fed'n, http://www.cifstate.org/index.php/other-approved-sports/field-hockey (last visited July 28, 2014).

an institution has recently eliminated a viable team . . . , there is sufficient interest, ability, and available competition to sustain a[] . . . team in that sport unless an institution can provide strong evidence that interest, ability, or available competition no longer exists."  1996 Clarification; *see also Cohen*, 101 F.3d at 180.  Castle Park's decision to cut field hockey twice during the relevant time period, coupled with its inability to show that its motivations were legitimate, is enough to show sufficient interest, ability, and available competition to sustain a field hockey team.

**E**

We conclude that Sweetwater has not fully and effectively accommodated the interests and abilities of its female athletes.  The district court did not err in its award of summary judgment to Plaintiffs on their Title IX unequal participation claim, and we affirm the grant of injunctive relief to Plaintiffs on that issue.

**III**

We review a district court's evidentiary rulings, such as its decisions to exclude expert testimony and to impose discovery sanctions, for an abuse of discretion, and a showing of prejudice is required for reversal.  *See Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 462 (9th Cir. 2014) (en banc); *see also United States v. Chao Fan Xu*, 706 F.3d 965, 984 (9th Cir. 2013) (exclusion of expert testimony); *R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1245 (9th Cir. 2012) (imposition of discovery sanctions for Rule 26(a) and (e) violations).

In non-jury cases such as this one, "the district judge is given great latitude in the admission or exclusion of evidence." *Hollinger v. United States*, 651 F.2d 636, 640 (9th Cir. 1981). The Supreme Court has said that district courts have "broad latitude" to determine whether expert testimony is sufficiently reliable to be admitted. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999). And "we give particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1)," which is "a recognized broadening of the sanctioning power." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001); *see also R & R Sails*, 673 F.3d at 1245 (same); *Jeff D. v. Otter*, 643 F.3d 278, 289 (9th Cir. 2011) ("[A] district court has wide discretion in controlling discovery.") (alteration in original) (internal quotation marks omitted).

## A

We first address the exclusion of defense experts. Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides that a witness "qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if":

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"It is well settled that bare qualifications alone cannot establish the admissibility of . . . expert testimony." *United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir. 2002). Rather, we have interpreted Rule 702 to require that "[e]xpert testimony . . . be both relevant and reliable." *Estate of Barabin*, 740 F.3d at 463 (alteration and ellipsis in original) (internal quotation marks omitted). A proposed expert's testimony, then, must "have a reliable basis in the knowledge and experience of his discipline." *Kumho Tire*, 526 U.S. at 148 (internal quotation marks omitted). This requires district courts, acting in a "gatekeeping role," to assess "whether the reasoning or methodology underlying the testimony" is valid and "whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93, 597 (1993) ("*Daubert I*"). It is not "the correctness of the expert's conclusions" that matters, but "the soundness of his methodology." *Estate of Barabin*, 740 F.3d at 463 (internal quotation marks omitted).

The district court excluded the proposed testimony of Peter Schiff—a retired superintendent of a different school district who would have testified about "the finances of schools and high school athletic programs, as well as equitable access to school facilities at Castle Park,"—because it could not "discern what, if any, method he employed in arriving at his opinions." The district court also found that Schiff's "conclusions appear to be based on his personal opinions and speculation rather than on a systematic

assessment of . . . athletic facilities and programs at [Castle Park]." Further, the district court called Schiff's site visits "superficial," and noted that "experience with the non-relevant issue of school finance" did not qualify him "to opine on Title IX compliance."

Similarly, the district court excluded the proposed testimony of Penny Parker—an assistant principal at a different high school who would have testified about the "unique nature of high school softball and its role at Castle Park,"—because her "methodology is not at all clear" and "her opinions are speculative . . . inherently unreliable and unsupported by the facts."

We assume without deciding that (1) Schiff and Parker's proposed testimony was relevant, and (2) Schiff and Parker were qualified as Title IX experts under Rule 702. Nonetheless, we conclude that the district court did not abuse its discretion when it struck both experts' proposed testimony. The record suggests that the district court's determination that Schiff and Parker's proposed testimony was based on, at best, an unreliable methodology, was not illogical or implausible.

Schiff did not visit Castle Park to conduct an in-person investigation until *after* he submitted his initial report on the case. And when he did visit, his visit was cursory and not in-season: Schiff only walked the softball and baseball fields. His opinion that the "girls' softball field was in excellent shape," then, was based on no more than a superficial visual examination of the softball and baseball fields. Schiff—who Sweetwater contends is qualified "to assess the state of the athletic facilities for both boys and girls teams" at Castle Park because of his "experience on the business side of athletics,"

his "extensive[]" work with CIF, and his high school baseball coaching tenure—did not enter the softball or baseball dugouts (or batting cages), and yet he sought to testify "on the renovations to the softball field, including new fencing, bleachers, and dugout areas."

Parker's only visit to Castle Park lasted barely an hour. And that visit was as cursory as Schiff's: Parker—a former softball coach who Sweetwater offered as an expert on "all aspects of the game of softball,"—"toured the Castle Park facilities," including the softball and baseball fields and boys and girls locker rooms, and "was present while both a baseball and a softball game were being played simultaneously." She "observed the playing surfaces, dugout areas, field condition, fencing, bleachers, and amenities," but only from afar. Like Schiff, Parker took no photographs and no measurements. She did not speak to anyone at Castle Park about the fields. And she admitted that her proposed testimony about the softball team's allegedly inferior fundraising and accounting practices was speculative.

Schiff and Parker based their proposed testimony on superficial inspections of the Castle Park facilities. Even if a visual walkthrough, without more, *could* be enough in some cases to render expert testimony admissible under Rule 702, it certainly does not *compel* that conclusion in all cases. Moreover, as the district court found, Schiff and Parker's conclusions were based on their "personal opinions and speculation rather than on a systematic assessment of [Castle Park's] athletic facilities and programs." But personal opinion testimony is inadmissible as a matter of law under Rule 702, *see Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995)("*Daubert II*"), and speculative testimony is inherently unreliable, *see Diviero v. Uniroyal*

*Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997); *see also Daubert I*, 509 U.S. at 590 (noting that expert testimony based on mere "subjective belief or unsupported speculation" is inadmissible).  We cannot say the district court abused its discretion when it barred Schiff and Parker from testifying at trial after finding their testimony to be "inherently unreliable and unsupported by the facts."  The district court properly exercised its "gatekeeping role" under *Daubert I*, 509 U.S. at 597.

**B**

We next address the exclusion of fact witnesses.  The general issue is whether witnesses not listed in Rule 26(a) disclosures—and who were identified 15 months after the discovery cutoff and only ten months before trial—were identified too late in the process.

The Federal Rules of Civil Procedure require parties to provide to other parties "the name . . . of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses."  Fed. R. Civ. P. 26(a)(1)(A)(i).  And "[a] party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure" in a "timely manner if the party learns that in some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  *Id.* R. 26(e).  A party that does not timely identify a witness under Rule 26 may not use that witness to supply evidence at a trial "unless the failure was substantially justified or is harmless."  *Id.* R. 37(c)(1); *see also Yeti by Molly*, 259 F.3d at 1105.  Indeed,

Rule 37(c)(1) is "intended to put teeth into the mandatory . . . disclosure requirements" of Rule 26(a) and (e).  8B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2289.1 (3d ed. 2014).

The district court excluded 38 Sweetwater witnesses as untimely disclosed, in violation of Rule 26(a) and (e), in part because it found "no reason why any of the 38 witnesses were not disclosed to [P]laintiffs either initially or by timely supplementation."   The district court concluded that "the mere mention of a name in a deposition is insufficient" to notify Plaintiffs that Sweetwater "intend[s] to present that person at trial," and that to "suggest otherwise flies in the face of the requirements of Rule 26."   And the district court reasoned that "[w]aiting until long after the close of discovery and on the eve of trial to disclose allegedly relevant and non-cumulative witnesses is harmful and without substantial justification."

A "district court has wide discretion in controlling discovery." *Jeff D.*, 643 F.3d at 289 (internal quotation marks omitted).   And, as we noted earlier, that discretion is "particularly wide" when it comes to excluding witnesses under Rule 37(c)(1).  *Yeti by Molly*, 259 F.3d at 1106.

Sweetwater argues that exclusion of 30 of its 38 witnesses was an abuse of discretion because (1) "Plaintiffs were made aware" of those witnesses during discovery—specifically, during Plaintiffs' depositions of other Sweetwater witnesses, and (2) any violation of Rule 26 "was harmless to Plaintiffs." Of the remaining eight witnesses, Sweetwater contends that untimely disclosure was both justified because those witnesses were not employed at Castle Park before the discovery cutoff date, and harmless because they were

disclosed more than eight months before trial.  We conclude that the district court did not abuse its discretion by imposing a discovery sanction. The record amply supports the district court's discretionary determination that Sweetwater's lapse was not justified or harmless.

Initial Rule 26(a) disclosures were due October 29, 2007. At least 12 of Sweetwater's 38 contested witnesses were Castle Park employees by that date.  The discovery cutoff was August 8, 2008, and lay witness depositions had to be completed by September 30, 2008.  At least 19 of the 38 witnesses were Castle Park employees by those dates.  And yet, Sweetwater did not disclose any of the 38 witnesses until November 23, 2009, more than 15 months after the close of discovery and less than a year before trial.

Sweetwater does not dispute that it did not formally offer the names of any of the 38 witnesses by the October 29, 2007, deadline for initial Rule 26(a) disclosures (or by the August 8, 2008, discovery cutoff, for that matter).  Nor does it dispute that it did not "supplement or correct its disclosure or response," *see* Fed. R. Civ. P. 26(a)(1), by offering the witnesses' names in accord with Rule 26(e).  Instead, Sweetwater contends that because other disclosed witnesses had mentioned the contested witnesses at their depositions, Plaintiffs were on notice that the contested witnesses might testify and were not prejudiced by untimely disclosure. Sweetwater contends, in essence, that it complied with Rule 26 because Plaintiffs knew of the contested witnesses' existence.

The district court did not abuse its discretion by rejecting Sweetwater's argument.  The theory of disclosure under the Federal Rules of Civil Procedure is to encourage parties to try

cases on the merits, not by surprise, and not by ambush. After disclosures of witnesses are made, a party can conduct discovery of what those witnesses would say on relevant issues, which in turn informs the party's judgment about which witnesses it may want to call at trial, either to controvert testimony or to put it in context. Orderly procedure requires timely disclosure so that trial efforts are enhanced and efficient, and the trial process is improved. The late disclosure of witnesses throws a wrench into the machinery of trial. A party might be able to scramble to make up for the delay, but last-minute discovery may disrupt other plans. And if the discovery cutoff has passed, the party cannot conduct discovery without a court order permitting extension. This in turn threatens whether a scheduled trial date is viable. And it impairs the ability of every trial court to manage its docket.

With these considerations in mind, we return to the governing rules. Rule 26 states that "a *party* must, without awaiting a discovery request, provide to the other parties . . . the name and, if known, the address and telephone number of each individual likely to have discoverable information." Fed. R. Civ. P. 26(a)(1)(A) (emphasis added). Compliance with Rule 26's disclosure requirements is "mandatory." *Repulic of Ecuador v. Mackay*, 742 F.3d 860, 865 (9th Cir. 2014).

The rule places the disclosure obligation on a "party." That another witness has made a passing reference in a deposition to a person with knowledge or responsibilities who could conceivably be a witness does not satisfy a party's disclosure obligations. An adverse party should not have to guess which undisclosed witnesses may be called to testify. We—and the Advisory Committee on the Federal Rules of

Civil Procedure—have warned litigants not to "'indulge in gamesmanship with respect to the disclosure obligations'" of Rule 26. *Marchand v. Mercy Med. Ctr.*, 22 F.3d 933, 936 n.3 (9th Cir. 1994) (quoting Fed. R. Civ. P. 26 advisory committee's note (1993 amend.)). The record shows that the district court did not abuse its discretion when it concluded that Sweetwater's attempt to obfuscate the meaning of Rule 26(a) was just this sort of gamesmanship. There was no error in the district court's conclusion that "the mere mention of a name in a deposition is insufficient to give notice to" Plaintiffs that Sweetwater "intend[ed] to present that person at trial."

The district court did not abuse its discretion when it concluded that Sweetwater's failure to comply with Rule 26's disclosure requirement was neither substantially justified nor harmless. *See* Fed. R. Civ. P. 37(c)(1). Sweetwater does not argue that its untimely disclosure of these 30 witnesses was substantially justified. Nor was it harmless. Had Sweetwater's witnesses been allowed to testify at trial, Plaintiffs would have had to depose them—or at least to consider which witnesses were worth deposing—and to prepare to question them at trial. *See Yeti by Molly*, 259 F.3d at 1107. The record demonstrates that the district court's conclusion, that reopening discovery before trial would have burdened Plaintiffs and disrupted the court's and the parties' schedules, was well within its discretion. The last thing a party or its counsel wants in a hotly contested lawsuit is to make last-minute preparations and decisions on the run. The late disclosures here were not harmless. *See Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1180 (9th Cir. 2008).

Nor did the district court abuse its discretion by finding that the untimely disclosure of the eight remaining witnesses also was not harmless. Allowing these witnesses to testify and reopening discovery would have had the same costly and disruptive effects. Nor was it substantially justified merely because the eight witnesses were not employed at Castle Park until after the discovery cutoff date. Sanctioning this argument would force us to read the supplementation requirement out of Rule 26(e). We will not do that.

Sweetwater did not comply with the disclosure requirements of Rule 26(a) and (e). That failure was neither substantially justified nor harmless. The district court did not abuse its discretion when it excluded Sweetwater's 38 untimely disclosed witnesses from testifying at trial.

## C

The next issue concerns whether the district court abused its discretion by declining to consider contemporaneous evidence at trial. On April 26, 2010, the district court set a June 15, 2010, cutoff date for Sweetwater to provide evidence of "continuous repairs and renovations of athletic facilities at Castle Park" for consideration at trial. Improvements made after June 15, 2010, but before the start of trial on September 14, 2010, the district court explained, would not be considered. Sweetwater did not then object to the district court's decision.

On appeal, however, Sweetwater argues that injunctive relief should be based on contemporaneous evidence, not on evidence of past harm. And if the district court had considered contemporaneous evidence at trial, Sweetwater

speculates, it would have found Castle Park in compliance with Title IX and would not have issued an injunction.

This argument fails for several reasons.  First, a "trial court's power to control the conduct of trial is broad." *United States v. Panza*, 612 F.2d 432, 438 (9th Cir. 1979). Establishing a cutoff date after which it would not consider supplemental improvements to facilities at Castle Park—especially one that was only 90 days before trial—aided orderly pre-trial procedure and was well within the district court's discretion.

Second, the district court *did* consider some of Sweetwater's remedial improvements, "particularly with respect to the girls' softball facility," but concluded that "those steps have not been consistent, adequate or comprehensive" and that "many violations of Title IX have not been remedied or even addressed."  Sweetwater's contention that "the District Court appeared to ignore key evidence of changed facilities" is unpersuasive.

Third, even if contemporaneous evidence showed that Sweetwater was complying with Title IX at the time of trial, the district court *still* could have issued an injunction based on past harm.  *See United States v. Mass. Mar. Acad.*, 762 F.2d 142, 157–58 (1st Cir. 1985).  The plaintiff class included *future* students, who were protected by the injunction. "Voluntary cessation" of wrongful conduct "does not moot a case or controversy unless subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (alteration in original) (internal quotation marks omitted).

Fourth, the district court found no evidence that Sweetwater had "addressed or implemented policies or procedures designed to cure the myriad areas of general noncompliance with Title IX." In light of the systemic problem of gender inequity in the Castle Park athletics program, the district court did not abuse its discretion by issuing an injunction requiring Sweetwater to comply with Title IX.

## IV

We review *de novo* a district court's decision to deny a Rule 12(b)(6) motion to dismiss.[12] *See Dunn v. Castro*, 621 F.3d 1196, 1198 (9th Cir. 2010). Similarly, whether a party has standing to bring a claim is a question of law that we review *de novo*. *See Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 907 (9th Cir. 2011). But we review a district court's fact-finding on standing questions for clear error. *See In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 747 (9th Cir. 2012).

Article III of the Constitution requires a party to have standing to bring its suit. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The elements of standing are well-established: the party must have suffered (1) an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of," meaning the injury has to be "fairly traceable to the challenged action of the defendant"; and (3) "it must be

---

[12] Because the district court construed Sweetwater's motion to strike Plaintiffs' Title IX retaliation claim as a Rule 12(b)(6) motion to dismiss that claim, *see Ollier*, 735 F. Supp. 2d at 1224, we do the same.

likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560–61 (alteration, ellipsis, citations, and internal quotation marks omitted).[13] "In a class action, standing is satisfied if at least one named plaintiff meets the requirements." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc).

The district court held that Plaintiffs had standing to bring their Title IX retaliation claim, but gave few reasons for its decision. *See Ollier*, 735 F. Supp. 2d at 1226. On appeal, Sweetwater argues, as it did before the district court, that Plaintiffs lack standing to enjoin the retaliatory action allegedly taken against Coach Martinez because students may not "recover for adverse retaliatory employment actions taken against" an educator, even if that educator "engaged in protected activity on behalf of the students." Sweetwater contends that while Coach Martinez would have had standing to bring a Title IX retaliation claim himself, the "third party" students cannot "maintain a valid cause of action for retaliation under Title IX for their coach's protected activity and the adverse employment action taken against the coach."

We reject this argument. It misunderstands Plaintiffs' claim, which asserts that Sweetwater impermissibly retaliated against *them* by firing Coach Martinez in response to Title IX

---

[13] Sweetwater does not contest that Plaintiffs' alleged harm is "fairly traceable" to them. Sweetwater's argument against redressability is premised on the idea that prospective injunctive relief cannot redress past harm. Because Plaintiffs' harm is ongoing, that argument fails. *See McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 284–85 (2d Cir. 2004); *see also N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 553 n.15 (1982) (Powell, J., dissenting). Only Plaintiffs' alleged injury in fact, then, is at issue in our analysis.

complaints he made on Plaintiffs' behalf.  With their softball coach fired, Plaintiffs' prospects for competing were hampered.  Stated another way, Plaintiffs' Title IX retaliation claim seeks to vindicate not Coach Martinez's rights, but Plaintiffs' own rights.  Because Plaintiffs were asserting their own "legal rights and interests," not a claim of their coach, the generally strict limitations on third-party standing do not bar their claim.  *See Warth v. Seldin*, 422 U.S. 490, 499 (1975).

Justice O'Connor correctly said that "teachers and coaches . . . are often in the best position to vindicate the rights of their students because they are better able to identify discrimination and bring it to the attention of administrators. Indeed, sometimes adult employees are the only effective adversaries of discrimination in schools." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 181 (2005) (alteration and internal quotation marks omitted). Sweetwater's position—that Plaintiffs lack standing because it was not they who made the Title IX complaints—would allow any school facing a Title IX retaliation suit brought by students who did not themselves make Title IX complaints to insulate itself simply by firing (or otherwise silencing) those who made the Title IX complaints on the students' behalf. We will "not assume that Congress left such a gap" in Title IX's enforcement scheme.  *Id.*

An injured party may sue under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, if he "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Thompson v. N. Am. Stainless, LP*, 131 S. Ct. 863, 870 (2011) (internal quotation marks omitted). Plaintiffs, of course, do not bring their suit under the APA,

but the Supreme Court has extended its "zone of interests" jurisprudence to cases brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, whose anti-retaliation provisions are analogous here. *See Thompson*, 131 S. Ct. at 870. And students like Plaintiffs surely fall within the "zone of interests" that Title IX's implicit anti-retaliation provisions seek to protect. *See Jackson*, 544 U.S. at 173–77.

Finally, the Supreme Court has foreclosed Sweetwater's position. Faced with the argument that anti-retaliation provisions limit standing to those "who engaged in the protected activity" and were "the subject of unlawful retaliation," the Court has said that such a position is an "artificially narrow" reading with "no basis in text or prior practice." *Thompson*, 131 S. Ct. at 869-70.[14] Rather, "any plaintiff with an interest arguably sought to be protected by" a statute with an anti-retaliation provision has standing to sue under that statute. *Id.* at 870 (alteration and internal quotation marks omitted). Students have "an interest arguably sought to be protected by" Title IX—indeed, students are the statute's very focus.

Coach Martinez gave softball players extra practice time and individualized attention, persuaded volunteer coaches to help with specialized skills, and arranged for the team to play in tournaments attended by college recruiters. The softball team was stronger with Coach Martinez than without him. After Coach Martinez was fired, Sweetwater stripped the softball team of its voluntary assistant coaches, canceled the team's 2007 awards banquet, and forbade the team from

---

[14] *Thompson v. North American Stainless, LP* was a Title VII case, but the Supreme Court's reasoning applies with equal force to Title IX.

participating in a Las Vegas tournament attended by college recruiters.  The district court found these injuries, among others, sufficient to confer standing on Plaintiffs.  We agree.

Plaintiffs have alleged judicially cognizable injuries flowing from Sweetwater's retaliatory responses to Title IX complaints made by their parents and Coach Martinez.  The district court's ruling that Plaintiffs have Article III standing to bring their Title IX retaliation claim and its decision to deny Sweetwater's motion to strike that claim were not error.

**V**

We review a district court's decision to grant a permanent injunction for an abuse of discretion, but we review for clear error the factual findings underpinning the award of injunctive relief, *see Momot v. Mastro*, 652 F.3d 982, 986 (9th Cir. 2011), just as we review for clear error a district court's findings of fact after bench trial.  *See Spokane Arcade, Inc. v. City of Spokane*, 75 F.3d 663, 665 (9th Cir. 1996). However, we review *de novo* "the rulings of law relied upon by the district court in awarding injunctive relief."  *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1177 (9th Cir. 2011) (internal quotation marks omitted).

We come to the substance of Plaintiffs' retaliation claim, an important part of this case.  "Title IX's private right of action encompasses suits for retaliation, because retaliation falls within the statute's prohibition of intentional discrimination on the basis of sex. . . . Indeed, if retaliation were not prohibited, Title IX's enforcement scheme would unravel."  *Jackson*, 544 U.S. at 178, 180.  The Supreme Court "has often looked to its Title VII interpretations . . . in illuminating Title IX," so we apply to Title IX retaliation

claims "the familiar framework used to decide retaliation claims under Title VII." *Emeldi v. Univ. of Or.*, 698 F.3d 715, 724–25 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 1997 (2013) (internal quotation marks omitted).

Under that framework, a "plaintiff who lacks direct evidence of retaliation must first make out a *prima facie* case of retaliation by showing (a) that he or she was engaged in protected activity, (b) that he or she suffered an adverse action, and (c) that there was a causal link between the two." *Id.* at 724. The burden on a plaintiff to show a *prima facie* case of retaliation is low. Only "a minimal threshold showing of retaliation" is required. *Id.* After a plaintiff has made this showing, the burden shifts to the defendant to "articulate a legitimate, non-retaliatory reason for the challenged action." *Id.* If the defendant can do so, the burden shifts back to the plaintiff to show that the reason is pretextual. *See id.*

## A

The district court found that Plaintiffs had made out a *prima facie* case of retaliation: They engaged in protected activity when they complained about Title IX violations in May and July 2006 and when they filed their complaint in April 2007. They suffered adverse action because the softball program was "significantly disrupted" when, among other things, Coach Martinez was fired and replaced by a "far less experienced coach." And a causal link between Plaintiffs' protected conduct and the adverse actions they suffered "may be established by an inference derived from circumstantial evidence"—in this case, the "temporal proximity" between Plaintiffs' engaging in protected activity in May 2006, July 2006, and April 2007, and the adverse actions taken against them in July 2006 and spring 2007.

Sweetwater contends that these findings were clearly erroneous because (1) "At most, the named plaintiffs who attended CPHS at the time of the complaints can legitimately state they engaged in protected activity"; (2) the district court did not articulate the standard it used to determine which actions were "adverse" and did not, as Sweetwater says was required, evaluate whether Plaintiffs "were denied access to the educational opportunities or benefits provided by the school as a direct result of retaliation"; and (3) there was no causal link between protected activity and adverse action because Coach Martinez was fired to make way for a certified, on-site teacher, not because of any Title IX complaints.

"In the Title IX context, speaking out against sex discrimination . . . is protected activity." *Id.* at 725 (alteration and internal quotation marks omitted). Indeed, "Title IX empowers a woman student to complain, without fear of retaliation, that the educational establishment treats women unequally." *Id.* That is precisely what happened here. The father of two of the named plaintiffs complained to the Castle Park athletic director in May 2006 about Title IX violations; Plaintiffs' counsel sent Sweetwater a demand letter in July 2006 regarding Title IX violations at Castle Park; and Plaintiffs filed their class action complaint in April 2007. These are indisputably protected activities under Title IX, and the district court's finding to that effect was not clearly erroneous.

It is not a viable argument for Sweetwater to urge that a class may not "sue a school district for retaliation in a Title IX athletics case." As we have previously held: "The existence of a private right of action to enforce Title IX is well-established." *Mansourian v. Regents of Univ. of*

*California*, 602 F.3d 957, 964 n.6 (9th Cir. 2010).  Further, a private right of action under Title IX includes a claim for retaliation.  As the United States Supreme Court has said: "Title IX's private right of action encompasses suits for retaliation, because retaliation falls within the statute's prohibition of intentional discrimination on the basis of sex. . . . Indeed, if retaliation were not prohibited, Title IX's enforcement scheme would unravel." *Jackson*, 544 U.S. at 178, 180.  Nor is it a viable argument for Sweetwater to complain that  only some members of the plaintiff's class who attended CPHS when complaints were made can urge they engaged in protected activity.  That the class includes students who were not members of the softball team at the time of retaliation, and who benefit from the relief, does not impair the validity of the relief.  *See Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 131 S. Ct. 863, 870, 178 L. Ed. 2d 694 (2011) (holding that Title VII "enabl[es] suit by any plaintiff with an interest arguably sought to be protected.") (internal quotations and alteration omitted); *Mansourian*, 602 F.3d at 962 (approving a class of female wrestlers "on behalf of all current and future female" university students). The relief of injunction is equitable, and the district court had broad powers to tailor equitable relief so as to vindicate the rights of former and future students.  *See generally* Dobbs on Remedies, §§ 2.4, 2.9.

Under Title IX, as under Title VII, "the adverse action element is present when 'a reasonable [person] would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable [person] from making or supporting a charge of discrimination.'" *Id.* at 726 (alterations in original) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  Sweetwater does not argue—because it cannot

argue—that the district court's adverse action findings do not satisfy this standard.[15]  The district court found that Plaintiffs' "successful softball program was significantly disrupted to the detriment of the program and participants" because: (1) Coach Martinez was fired and replaced by a "far less experienced coach"; (2) the team was stripped of its assistant coaches; (3) the team's annual award banquet was canceled in 2007; (4) parents were prohibited from volunteering with the team; and (5) the team was not allowed to participate in a Las Vegas tournament attended by college recruiters.  It was not clear error for the district court to conclude that a reasonable person could have found any of these actions "materially adverse" such that they "well might have dissuaded [him] from making or supporting a charge of discrimination."  *Id.* (internal quotation marks omitted).

We construe the causal link element of the retaliation framework "broadly"; a plaintiff "merely has to prove that the protected activity and the [adverse] action are not completely unrelated."  *Id.* (internal quotation marks omitted).  In Title VII cases, causation "may be inferred from circumstantial evidence, such as the [defendant's] knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory" conduct.  *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).  *Emeldi* extended that rule to Title IX cases.  *See* 698 F.3d at 726 ("[T]he proximity in time

---

[15] Rather, Sweetwater contends that the district court applied the wrong standard and that Plaintiffs, to show adverse action, must prove "that they were denied access to the educational opportunities or benefits provided by the school as a direct result of retaliation."  Our decision in *Emeldi v. University of Oregon*, however, illustrates that Sweetwater's position is simply not the law.

between" protected activity and allegedly retaliatory action can be "strong circumstantial evidence of causation."). Plaintiffs have met their burden: They engaged in protected activity in May 2006, July 2006, and April 2007. Coach Martinez was fired in July 2006 and the annual awards banquet was canceled in Spring 2007. The timing of these events is enough in context to show causation in this Title IX retaliation case. That the district court found as much was not clearly erroneous. Plaintiffs state a *prima facie* case of Title IX retaliation.

### B

Sweetwater offered the district court four legitimate, non-retaliatory reasons for firing Coach Martinez: First, Castle Park wanted to replace its walk-on coaches with certified teachers. Second, Coach Martinez mistakenly played an ineligible student in 2005 and forced the softball team to forfeit games as a result. Third, he allowed an unauthorized parent to coach a summer softball team. Fourth, he filed late paperwork related to the softball team's participation in a Las Vegas tournament—a mishap that Sweetwater said created an unnecessary liability risk. The district court rejected each reason, concluding that all four were "not credible and are pretextual."

Sweetwater argues on appeal that the district court committed clear error by disregarding these legitimate, non-retaliatory reasons because it "failed to evaluate and weigh the evidence before it" when it "looked past the abundance of uncontradicted information preexisting the Title IX complaints . . . and focused almost entirely" on Coach Martinez's termination. Sweetwater also adds that Castle Park did not renew Coach Martinez's contract in part because

"he was a mean and intimidating person" who often spoke in a "rough voice" and could be "abrasive." Coach Martinez, Sweetwater contends, "did not possess the guiding principles required of a coach because he constantly failed to follow the rules" at Castle Park.

Sweetwater disregards the salient fact that the district court held a trial on retaliation. The district court could permissibly find that, on the evidence it considered, Sweetwater's non-retaliatory reasons for firing Coach Martinez were a pretext for unlawful retaliatory conduct. First, Sweetwater contends that Castle Park fired Coach Martinez "primarily" because he allowed an unauthorized parent to coach a summer league team, but also that this incident merely "played a role" in his firing, and that the reason given Martinez when he was fired was that Castle Park "wanted an on-site coach." These shifting, inconsistent reasons for Coach Martinez's termination are themselves evidence of pretext. *See Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 569 (9th Cir. 2004) ("From the fact that Raytheon has provided conflicting explanations of its conduct, a jury could reasonably conclude that its most recent explanation was pretextual.").

Second, the district court's findings underlying its conclusion that Sweetwater's "stated reasons for Martinez's termination are not credible and are pretextual" are convincing and not clearly erroneous. Coach Martinez was not fired as part of a coordinated campaign to replace walk-on coaches with certified teachers, as Sweetwater contends. There was a preference for certified teachers in place long before Coach Martinez was hired, and there was no certified teacher ready to replace him after he was fired. Nor was the district court required by the evidence to find that Coach

Martinez was fired because he played an ineligible student and forced the softball team to forfeit games as a result. This incident occurred during the 2004–2005 school year, but Coach Martinez was not reprimanded at the time and was not fired until more than a year later. Also, eligibility determinations were the responsibility of school administrators, not athletics coaches.

Sweetwater's argument that it fired Coach Martinez because he let an unauthorized parent coach a summer softball team is specious. Not only was Coach Martinez absent when the incident occurred, but he forbade the parent from coaching after learning of his ineligibility to do so. Moreover, the summer softball team in question "was not conducted under the auspices of the high school." Finally, while Coach Martinez did file late paperwork for the Las Vegas tournament, he was not then admonished for it. As with the ineligible player incident, the timing of his termination suggests that Sweetwater's allegedly non-retaliatory reason is merely a *post hoc* rationalization for what was actually an unlawful retaliatory firing. *See Gaffney v. Riverboat Servs. of Ind., Inc.*, 451 F.3d 424, 452 (7th Cir. 2006) (concluding that a district court's finding that "defendants first fired the plaintiffs and then came up with *post hoc* rationalizations for having done so" was not clearly erroneous).

On the record before it, the district court correctly could find that Coach Martinez was fired in retaliation for Plaintiffs' Title IX complaints, not for any of the pretextual, non-retaliatory reasons that Sweetwater has offered.

## C

Having determined that the district court did not clearly err when it found (1) that Plaintiffs established a *prima facie* case of Title IX retaliation, and (2) that Sweetwater's purported non-retaliatory reasons for firing Coach Martinez were pretextual excuses for unlawful retaliation, we conclude that it was not an abuse of discretion for the district court to grant permanent injunctive relief to Plaintiffs on their Title IX retaliation claim. We affirm the grant of injunctive relief to Plaintiffs on that issue.[16]

## VI

We reject Sweetwater's attempt to relitigate the merits of its case. Title IX levels the playing fields for female athletes. In implementing this important principle, the district court committed no error.

**AFFIRMED.**

---

[16] We also affirm the grant of injunctive relief to Plaintiffs on their Title IX unequal treatment and benefits claim, any objection to which Sweetwater waived on appeal by not arguing it. *See Hall*, 697 F.3d at 1071.